Gerhard WUNDERLICH and Nanett Wunderlich *v.*
Rebecca Sue ALEXANDER

CA 02–250                                            92 S.W.3d 715

Court of Appeals of Arkansas
Divisions I, II and III
Opinion delivered December 18, 2002

*Bart Ziegenhorn*, for appellant.

*Mark Pryor*, Att'y Gen., by: *David R. Raupp*, Sr. Ass't Att'y Gen., for appellee.

*Ralph C. Goza*, for appellant.

*Eugene D. Bramblett*, for appellee.

JOHN E. JENNINGS, Judge. Appellants, Gerhard and Nanett Wunderlich, appeal from an order setting aside the decree in which they adopted their granddaughter. For reversal, appellants contend that the trial court erred in setting aside the decree past the one-year period set out in Ark. Code Ann. § 9-9-216(b) (Repl. 2002); that the trial court's finding of fraud is clearly erroneous; and that the trial court erred in proceeding without the child's natural father because he was a necessary and indispensable party. We find no reversible error and affirm.

Appellee, Becky Alexander, gave birth to the child, W.W., on September 26, 1993, during her twenty-month marriage to William Roy Duncan. Becky and Mr. Duncan separated when

W.W. was six weeks old, and Becky and the child moved into the home of Becky's mother and stepfather, the appellants Nan and Jerry Wunderlich. When Becky and Duncan divorced in July 1994, Becky was awarded custody of W.W., and Duncan was ordered to pay $200 a month in child support.

In April 1996, the Office of Child Support Enforcement filed a claim against Duncan for unpaid child support. In that action, Duncan filed a counterclaim seeking visitation with the child. Becky and Ms. Wunderlich visited with an attorney, and it was decided that appellants would adopt the child. It is undisputed that the sole reason this avenue was chosen was to extinguish Mr. Duncan's parental rights and thereby prevent him from having any contact with the child. To that end, Becky signed a release in favor of Duncan in which she agreed to forgo collecting future child support in exchange for Duncan's consent to the adoption. With Becky and Duncan's consent, appellants adopted W.W. by decree dated July 30, 1996.

As before the adoption, Becky and W.W. continued to reside with appellants until June 1999 when Becky married Joe Alexander, at which time Becky and the child went to live with Mr. Alexander. Although the child lived with Becky and her husband, the child stayed with appellants most weekends. Becky and Mr. Alexander had a daughter of their own in the spring of 2000.

On April 27, 2001, the parties fell into disagreement over the payment of debts Becky had incurred for the purchase of property retained by appellants, and appellants thereafter refused to allow Becky to see the child. On June 8, 2001, Becky filed this petition to set aside the adoption decree on grounds of fraud. Appellants moved to dismiss the petition because it was filed outside the one-year limitations period for challenging adoptions, and they also moved to join Mr. Duncan as a necessary and indispensable party. After hearing testimony, the trial court denied appellants' motion to dismiss and granted Becky's petition to set aside the adoption.

■ ■ Appellants' first argument is that the trial court erred in setting aside the adoption after one year. Arkansas Code Annotated section 9-9-216(b) (Repl. 2002) sets out the limitations period for contesting adoptions and provides as follows:

(b) Subject to the disposition of an appeal, upon the expiration of one (1) year after an adoption decree is issued, the decree cannot be questioned by any person including the petitioner, in any manner upon any ground, including fraud, misrepresentation, failure to give any required notice, or lack of jurisdiction of the parties or of the subject matter *unless, in the case of the adoption of a minor, the petitioner has not taken custody of the minor* or, in the case of the adoption of an adult, the adult had no knowledge of the decree within the one-year period. [Emphasis added.]

At issue in this case is whether appellants had "taken custody" of the child so as to permit the adoption decree to be set aside beyond the one-year period. The question of whether adoptive parents have "taken custody" is one of fact. *See Coker v. Child Support Enforcement Unit,* 69 Ark. App. 293, 12 S.W.3d 669 (2000). The decision of a probate judge will not be disturbed unless it is clearly erroneous, giving due regard to the opportunity and superior position of the trial judge to determine the credibility of the witnesses. *Cassat v. Hennis,* 74 Ark. App. 226, 45 S.W.3d 866 (2001).

At the hearing, Becky testified that she and Duncan had divorced because he had a drinking problem and was abusive. She said that W.W. was two-and-a-half years old when Duncan filed the counterclaim requesting visitation and that the child had never seen him. She testified that they were all alarmed at the prospect of Duncan obtaining visitation with the child. Becky said that her first idea was to ask the child-support enforcement unit to drop its case against Duncan, but she said that appellants told her that the enforcement unit would not do that. She said that appellants brought up the idea of an adoption before she and Ms. Wunderlich consulted with the attorney. Becky testified that she had not wanted an adoption and that she had expressed this to Ms. Wunderlich at the attorney's office. Becky testified that Ms. Wunderlich told her that, "I promise, I will never take your daughter away from you. You will always be her mother. If you remarry, your husband can adopt her." Becky said she agreed to the adoption based on her mother's assurances. She described it as a "pretend adoption" and said that the adoption was not to change anything in terms of her being W.W.'s mother. She testified that, in fact, nothing did change. The child referred to Becky as "mommy,"

and called appellants "papa" and "grandma." She said that she and W.W. continued to share a bedroom in appellants' home and that she attended to the child's day-to-day needs and was her primary caretaker as she had been before the adoption. Becky testified that Ms. Wunderlich never told her what she could or could not do with the child and that she was in control of her daughter. She said that Ms. Wunderlich had advised the principal and teacher when they enrolled W.W. in kindergarten that Becky was the child's mother and was responsible for her. Becky was listed as the child's primary emergency contact at the school, and the child's report cards were directed to and signed by Becky. Becky testified that she worked and contributed to the household expenses. She said that she paid for W.W.'s medical care except for the child's tonsillectomy, which was covered by appellants' insurance. Becky testified that it was not an issue for her to have taken W.W. with her when she remarried and that it was not even a topic of discussion.

Robin Gramly, Becky's sister and Ms. Wunderlich's daughter, testified that she had spoken with her mother about the adoption and that her mother told her that the adoption was "on paper only" and that it was strictly a way to keep Mr. Duncan from seeing W.W. Ms. Gramly also said that her mother assured her that the adoption would not change the relationship between Becky and the child and that the adoption would be reversed when Becky remarried or became financially stable. Gramly said that Becky was primarily responsible for the child both before and after the adoption and that there was never any question about whom W.W. would live with when Becky remarried.

Brenda Lee Stegeman, who was once married to Becky's brother and Ms. Wunderlich's son, testified that Ms. Wunderlich told her in reference to the adoption that "I'm the grandmother. Becky is the mother." Ms. Wunderlich also told her that the adoption would be undone if Becky remarried or got on her feet financially. Ms. Stegeman said that Becky was always the child's mother and that the adoption did not change the way the child was cared for.

Ms. Wunderlich testified that Becky was upset and asked for advice when Duncan filed the counterclaim for visitation. She accompanied Becky to a lawyer's office, and she said that the lawyer told them that the adoption would be the best thing to do since Becky and the child already lived with them. She testified that the purpose of the adoption was to get Duncan out of the child's life and that there was never an intent to take the child away from Becky. Ms. Wunderlich testified that she considered W.W. to be her grandchild after the adoption and that the adoption changed nothing in terms of how the child was cared for. She said that everyone in the community knew that W.W. was Becky's child. Ms. Wunderlich agreed that she had explained to the school principal and teacher that Becky was W.W.'s mother, and she said that Becky was responsible for the child at school. She also testified that it was understood that W.W. would live with Becky when she remarried. She said that, after Becky's marriage, the child stayed with them most weekends when Becky had no other plans for her, and she agreed that Becky had control and that it was up to Becky whether they kept the child on weekends.

■ Based on these peculiar facts and circumstances, we believe the trial court could find that appellants had never taken custody of the child. Becky and W.W. had lived with appellants since the child was six weeks old, and they continued to live with appellants after the decree just as they had before the adoption. The testimony was clear that the parties' respective relationships with the child did not change with the adoption and that appellants did not consider W.W. to be their child or hold the child out to be their own in the community. It is equally clear that Becky and the child lived with appellants as a matter of convenience and familial affection and that they remained in appellants' home after the adoption for those same reasons and not because appellants required them to do so. Indeed, there was no question but that Becky would take the child to live with her and her husband when she remarried. On this record, we cannot say that the trial court's decision is clearly erroneous.

■ We are mindful that the commentary to the Uniform Revised Adoption Act states that § 9-9-216(b) is designed to impose a short statute of limitation on the ability to set aside an

adoption decree in order to promote the policy of stability in a family relationship. *See also Martin v. Martin*, 316 Ark. 765, 875 S.W.2d 819 (1994). We are not persuaded that the trial court's ruling is inconsistent with this policy. The statute itself provides an exception to the one-year limitations period where the adoptive parents have not "taken custody" of the minor child. We hold only that, on these facts, the trial court's finding on that issue is not clearly erroneous.

Appellants' second issue is that the trial court's finding of fraud is clearly erroneous. We disagree.

The fraud which entitles a party to impeach a judgment must be fraud extrinsic of the matter tried in the cause, and does not consist of any false or fraudulent act or testimony, the truth of which was or might have been in issue in the proceeding before the court which resulted in the judgment assailed. *Parker v. Sims*, 185 Ark. 1111, 51 S.W.2d 517 (1932). It must be a fraud practiced upon the court in the procurement of the judgment itself. *Alexander v. Alexander*, 217 Ark. 230, 229 S.W.2d 234 (1950). The party seeking to set aside the judgment has the burden of showing that the judgment was obtained by fraud, and the charge of fraud must be sustained by clear, strong, and satisfactory proof. *First Nat'l Bank v. Higginbotham Funeral Serv.*, 36 Ark. App. 65, 818 S.W.2d 583 (1991). Here, there was testimony that the adoption was a sham, a "pretend adoption," and one "on paper only." It was not intended by the parties to sever the relationship between Becky and W.W. or to establish a parental relationship between appellants and the child. We cannot say the trial judge's finding that a fraud was practiced on the court in procuring the decree is clearly erroneous.

Appellants' last argument is that the trial court erred in proceeding without the natural father because he was a necessary and indispensable party to the action under Ark. R. Civ. P. 19(2)(i). The order entered by the trial court does not reflect a ruling on that point. We will not review a matter on which the trial court has not ruled; and, a ruling should not be presumed. *Vaughn v. State*, 338 Ark. 220, 992 S.W.2d 785 (1999). The burden of obtaining a ruling on this issue was on the appellants, and

the failure to do so, leaving the issue unresolved, operates as a waiver of the argument on appeal. *St. Paul Fire & Marine Ins. Co. v. First Bank of Ark.*, 341 Ark. 851, 20 S.W.3d 372 (2000).

Affirmed.

PITTMAN, BIRD, GRIFFEN, and ROAF, JJ., agree.

HART, ROBBINS, NEAL, and VAUGHT, JJ., dissent.

WENDELL L. GRIFFEN, Judge, concurring. As best as I can determine, there exists no case nationwide that specifically addresses the issue at hand, namely what constitutes a change in custody within the context of an adoption proceeding, particularly where the natural mother remains in the residence of the adopting grandparents. I write this concurring opinion to emphasize the difference between custody within the adoption context and custody in the child-support context. In the context of an adoption statute, we should not place undue weight on decisions dealing with custody in the divorce context.

Questions of custody in the divorce context do not involve abolition of the parental relationship. *See, e.g., J.T. v. Arkansas Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997). Rather, they focus on which of the parents should exercise the legal right of physical control and responsibility for the child. *See, e.g., Wilson v. Wilson*, 67 Ark. App. 48, 991 S.W.2d 647 (1999).

In contrast, questions of custody in the adoption context do involve abolition of the parental relationship. *See, e.g., Vice v. Andrews*, 328 Ark. 573, 945 S.W.2d 914 (1997); *see also Brown v. Johnson*, 10 Ark. App. 110, 661 S.W.2d 443 (1983) (Glaze, J., dissenting) (discussing that appellate courts should not treat adoption cases as though they were custody actions because in custody cases, the law recognizes the importance of the existing family relationship, whereas in adoption proceedings, existing family ties are severed). Potential adoptive parents as well as their legal counsel should understand that adoption law operates to create real and lasting relationships of a parent to a child where previously no such relationship existed. If the petitioners are unwilling to conduct themselves consistent with the relationship they petition the

law to recognize, they have no relationship deserving of protection.

In the present case, physical control is not the real issue. In fact, merely focusing on physical control confuses analysis. For instance, appellants clearly exercised physical control over W.W. when they refused to allow appellee to have her daughter following the disagreement over unpaid bills allegedly owed by the grandmother-appellant. However, despite physical control, the grandmother acknowledged that she did not rely on the adoption decree in seeking to regain control of W.W. Instead, the grandmother continued to acknowledge that appellee is W.W.'s mother, as stated in the majority opinion.

Appellants should have engaged in conduct consistent with the meaning of custody within the adoption context. At a minimum, this means that they should have treated W.W. as their child, not their granddaughter. They should have insisted that others, including appellee, treat W.W. as their child. Appellants should have resisted any efforts by appellee to dispute a parent-child relationship between themselves and W.W., no matter where appellee resided and with whom. If appellants had insisted, for instance, that appellee and the rest of the relevant community treat W.W. as her *sister* following the adoption decree, that course of conduct would have been consistent with a finding that appellants had taken custody of W.W. even with appellee remaining in the residence. Instead, as stated *supra*, appellants treated W.W. as their granddaughter and appellee as W.W.'s mother. For all practical purposes insofar as their dealings with W.W. were concerned, they treated the adoption proceeding as a fiction, if not a farce. Consequently, they forfeit the protection afforded by the statutory limitations period contained in our adoption statute, which was plainly enacted to create finality and stability to the new parent-child relationship. By refusing to validate the kind of conduct engaged in by appellants in this case, our decision preserves the integrity of our adoption statute.

Finally, I am unimpressed by the argument that appellee was defrauded by appellants. As far as I can establish from reviewing the record, appellee knowingly consented to the ruse whereby

appellants would appear to adopt W.W. in order to defeat the child custody and visitation rights of the child's father after their marriage failed. Appellee was disappointed by appellants, but they did not defraud her. Even her sister told her that the adoption ruse was a mistake. I join the decision to affirm the trial court because appellants did not take custody within the meaning of the adoption context so as to consummate the decree they sought. Had they done so, the parent-child relationship between appellee and W.W. would have been objectively abolished and replaced by a new relationship in which appellants would be parents, W.W. would be their child, and appellee would be the sister of W.W., no matter where the child lived or who owed whatever to whom.

JOSEPHINE LINKER HART, Judge, dissenting. The relevant statute provides as follows:

> Subject to the disposition of an appeal, upon the expiration of one (1) year after an adoption decree is issued, the decree cannot be questioned by any person including the petitioner, in any manner upon any ground, including fraud, misrepresentation, failure to give any required notice, or lack of jurisdiction of the parties or of the subject matter unless, in the case of the adoption of a minor, the petitioner has not taken custody of the minor or, in the case of the adoption of an adult, the adult had no knowledge of the decree within the one-year period.

Ark. Code Ann § 9-9-216(b) (Repl. 2002). The adoption decree was issued more than one year before the motion to set aside was filed; therefore, the setting aside of the decree would require (1) a finding that appellants had not "taken custody of the minor"; and (2) that the adoption was improperly obtained by the parties' failure to fulfill the requirements of the law. I conclude that neither condition was met, and I respectfully dissent.

First, the majority concludes that "[b]ased on these peculiar facts and circumstances, we believe that the trial court could find that the appellants had never taken custody of the child." I note, however, that the trial court did not make this finding. Rather, the judge found that "the adoption was done . . . not for the purpose of transferring custody to the adoptive parents." Thus, the majority assumes that the court found that the appellants never

took custody. However, even making this assumption, I cannot agree that appellants failed to take custody.

"Custody" is well defined in the law. Even *Black's Law Dictionary* has laid out useful definitions for custody in various contexts. According to the dictionary, there is "legal custody," which is "[t]he care, control, and maintenance of a child awarded by a court to a relative. . . ." Further, there is "physical custody, " which is "[t]he right to have the child live with the person awarded custody by the court." Also, there is "joint custody," where responsibility for and authority over the child is shared at all times. There is "divided custody," where custody and full control of and responsibility for the child is part-time. And there is "sole custody," where the party has full control of and responsibility for the child. BLACK'S LAW DICTIONARY 390 (7th ed. 1999).

After the adoption decree was entered, the child resided in the same household as appellee and appellants. After appellee's remarriage, she moved out of appellants' residence. During that time, the child resided with appellee during the week and with appellants on the weekends, when they asked. Appellee and appellants had a falling out over money, and following the weekend of April 27, 2001, appellants prevented appellee from seeing the child.

The majority fails to recognize that there was a change of legal status that occurred by operation of law when the adoption was granted. Legal custody, by operation of law, was placed in appellants, and the taking of the child into the home was physical custody. At that point in time, the child for all purposes became the child of appellants, and appellee became the older sister of the child. The majority does not explain why appellants did not have some form of "custody," other than to suggest that appellee had some form of custody. Since physical custody is the majority's polestar, it is readily apparent that to reach its conclusion, the majority must, at a minimum, ignore the salient fact that even appellee testified that she was ultimately precluded from seeing the child. The majority does not, and cannot, explain why, after appellants prevented appellee from seeing the child on April 27, 2001, as they were legally permitted to do by the adoption decree,

appellants did not have sole custody. Even appellee concedes in her brief that custody was taken by appellants on that day.

The majority appears to suggest that only exclusive physical custody is sufficient to meet the statutory requirement that prohibits the court from setting aside the adoption decree. I see nothing in the statute that mandates or even suggests that the adoptive parent must have exclusive custody in order to validate the adoption. The presence of the child in appellants' home suggests, at a minimum, joint custody, and such custody is sufficient, in my opinion, to cause the statutory one-year time limitation to commence running. Further, even if the majority were correct, appellants had sole custody when they refused to return the child to appellee.

While the majority nobly strains to limit this case to "these peculiar facts and circumstances," by refusing to recognize that exclusive care, control, and authority over a minor does not constitute "custody," the majority has opened a Pandora's Box. For example, this case can serve as a basis for all adoptive parents to seek relief from support obligations when, after the adoption, the relationship between the biological parent and the adoptive parent ends in divorce. Despite the child's presence in the home, the adoptive parent may argue that the child was never his responsibility, only the biological parent had responsibility for the child. This possibility is untenable.

Second, I also disagree with the majority on the second issue in this case, which is whether appellee established that fraud was committed. I agree with the majority insofar as they conclude that even if custody was not taken, appellee is required to establish fraud or some other ground on which to void the adoption. Failing to take custody does not itself constitute a challenge to the adoption. Rather, failing to take custody serves as an exception to the one-year statute of limitations for challenges to the adoption based on such grounds as fraud.

However, the majority errs in concluding that fraud was established. The trial court held that "[i]t appears the adoption was done to defraud the Court and the natural father. . . ." I would hold that fraud was not established by appellee because of a

failure of proof. Appellee failed to present any evidence that the court issuing the adoption decree was unaware that the adoption's sole purpose was "not intended by the parties to sever the relationship . . . or establish a parental relationship. . . ." In fact, the record does not contain a transcript of the adoption proceedings. Further, no witness testified as to the evidence presented to the court at the adoption proceedings. Thus, the majority's conclusion that fraud was practiced upon the court in procuring the adoption decree is based on pure speculation, not, as the majority claims, "clear, strong, and satisfactory proof."

There is no evidence before the court that the probate court was deceived into believing that the adopted child's biological father, the appellee, and the appellants wanted the legal relationship of parent and child created between the appellants and their grandchild when in fact these parties did not want that legal relationship to be created. There is no evidence in the record before us that the probate court did anything more or less than what all the parties before it were asking it to do, *i.e.*, alter the legal relationships between them and the child.

As to the trial court's finding that the adoption proceeding was done to defraud the biological father, with all due respect, the biological father does not contend such. In fact, he was not even made a party to the present proceeding. As a matter of law, by setting aside the adoption decree, the trial court has effectively reinstated his parental obligations without hearing from him at all on the matter.

As Justice Oliver Wendell Holmes, Jr., observed, "[H]ard cases make bad law." *Northern Securities Co. v. United States*, 193 U.S. 197, 400 (1904)(Holmes, J., dissenting) I respectfully dissent.

ROBBINS, NEAL, and VAUGHT JJ., join.