J.T. *v.* ARKANSAS DEPARTMENT of HUMAN SERVICES

96-1006                                             947 S.W.2d 761

Supreme Court of Arkansas
Opinion delivered June 30, 1997

*Suzanne Penn*, for appellant.

*Ed Wallen*, Office of Chief Counsel, for appellee.

*Merry Alice Bost Hesselbein*, Guardian Ad Litem.

DONALD L. CORBIN, Justice. Appellant J.T. appeals the judgment of the Pulaski County Chancery Court terminating her parental rights to T.T., who is now thirteen years of age, pursuant to Ark. Code Ann. § 9-27-341 (Supp. 1995), and authorizing Appellee Arkansas Department of Human Services ("DHS") to consent to the adoption of T.T. Appellant raises three points for reversal that necessarily involve our interpretation of section 9-27-341; hence, our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(a)(17)(vi) (as amended by *per curiam* July 15, 1996). We find no error and affirm.

## Facts and Procedural History

The duration of this case was approximately two years, during which time there were numerous hearings conducted before the chancery court. The evidence presented below reveals the following facts. On March 18, 1994, DHS filed a petition for emergency custody of T.T., asserting that the child was dependent-neglected as defined in Ark. Code Ann. § 9-27-303 (Repl. 1993). The affidavit attached to the petition reflected that T.T. was at risk for emotional abuse due to the fact that she was living with her mother in a shelter, that her mother had a history of running from shelter to shelter, state to state, and that T.T. was not attending school regularly. The affidavit particularly described two specific incidents which had occurred at T.T.'s school. On March 16, 1994, Appellant forced T.T. into school through the use of an armlock behind the child's back and by pulling the child's hair. When T.T. visited with the school counselor that same date, the

child reported that she had experienced pictures in her head, that she had no memories of earlier times in her childhood, and that she had been in foster care when she was two years of age and had been sexually abused. On March 17, 1994, Appellant again accompanied T.T. to school where Appellant lost control, display- ing disruptive behavior and loud cursing for approximately forty minutes. The affidavit also indicated that a psychiatrist at the Arkansas Children's Hospital had diagnosed Appellant as being mentally ill, but that Appellant had not accepted services which would comply with prescribed treatment. Additionally, T.T. was exhibiting the same symptoms that Appellant had, such as delu- sions and paranoia. The order granting the emergency custody was filed on March 22, 1994.

After a hearing on April 22, 1994, and based on the stipula- tion of the parties that the allegations contained in the petition were true, T.T. was adjudicated dependent-neglected. The stated goal of the case was one of reunification of the family. In the meantime, T.T. was ordered to pursue residential treatment and to participate in family therapy with Appellant. Appellant was like- wise ordered to seek treatment by receiving a psychological evalu- ation and following any recommendations for medication and treatment.

On August 31, 1995, DHS filed a petition to terminate Appellant's parental rights. The petition stated that the minor child had resided outside the parental home for a period in excess of one year and, despite meaningful effort by DHS to rehabilitate the home and correct the conditions which caused removal, the conditions had not been remedied by Appellant to the extent that she was able to provide for the essential and basic needs, as well as the specific emotional needs, of T.T. Appellant responded to the petition by arguing that (1) DHS had violated the Americans with Disabilities Act by denying her visitation with T.T. and (2) the trial court had unlawfully delegated judicial authority by allowing visitation to be determined by what the child's therapist recom- mended and by what the child desired.

After receiving testimony and other evidence during four separate hearings conducted on December 8, 1995, January 26,

1996, March 5, 1996, and March 15, 1996, the trial court entered an order terminating Appellant's parental rights and authorizing DHS to consent to the adoption of T.T. This appeal followed.

*Termination of Parental Rights*

■ For her first point for reversal, Appellant argues that the trial court erred in finding clear and convincing evidence to terminate her parental rights. This court has stated that when the burden of proving a disputed fact in chancery is by clear and convincing evidence, the inquiry on appeal is whether the chancery court's finding that the disputed fact was proven by clear and convincing evidence is clearly erroneous. *Anderson v. Douglas,* 310 Ark. 633, 839 S.W.2d 196 (1992). Clear and convincing evidence is defined as "that degree of proof which will produce in the factfinder a firm conviction as to the allegation sought to be established." *Id.* at 637, 839 S.W.2d at 198. In making such determination, we must give due regard to the opportunity of the trial court to judge the credibility of the witnesses. *Id.*

■ When the issue is one involving the termination of parental rights, there is a heavy burden placed upon the party seeking to terminate the relationship. *Id.; Bush v. Dietz,* 284 Ark. 191, 680 S.W.2d 704 (1984). Termination of parental rights is an extreme remedy and is in derogation of the natural rights of the parents. *Anderson,* 310 Ark. 633, 839 S.W.2d 196. This is not to say, however, that parental rights should be allowed to continue to the detriment of the child's welfare and best interests. In *Burdette v. Dietz,* 18 Ark. App. 107, 711 S.W.2d 178 (1986), the court of appeals held:

> While we agree that the rights of natural parents are not to be passed over lightly, these rights must give way to the best interest of the child when the natural parents seriously fail to provide reasonable care for their minor children. Parental rights will not be enforced to the detriment or destruction of the health and well-being of the child.

*Id.* at 109, 711 S.W.2d at 180.

■ Section 9-27-341 provides for the termination of parental rights upon petition by DHS. Subsection (a) provides in part:

> The intent of this section is to provide permanency in a juvenile's life in all instances where return of a juvenile to the family home is contrary to the juvenile's health, safety, or welfare, and it appears from the evidence that return to the family home cannot be accomplished in a reasonable period of time.

Subsection (b) provides that an order terminating parental rights shall be based on a finding by clear and convincing evidence that it is in the best interest of the juvenile based upon one of the enumerated grounds, including a finding that the minor child has been adjudicated dependent-neglected, has been out of the home for twelve months, and, despite meaningful effort by DHS to rehabilitate the home and correct the conditions which caused removal, the conditions have not been remedied by the parent.

During the hearings conducted below, the following pertinent evidence was presented. T.T., who was eleven years of age at the time she testified, said she wanted to live with her foster mother because she had more of a normal life and she felt safer there. She said she had a regular school to go to and that she was not afraid that she would have to move around again. She said she did not really have a normal life when she lived with her mother, and that if she had to live with her mother again, it would not be good because her mother could not take care of her and would probably move again. She said her mother was hardly taking care of herself. She said that there were times when she was afraid while she was with her mother, and that sometimes her mother would "act like she was fighting a sumo wrestler or something." She indicated that she was afraid that she would catch her mother's disease, and that she knew for a fact that she could catch the disease because when she lived with her mother, she started acting like her mother. She said that she felt sad about her mother's right to visit her in the future being taken away because she did not want to hurt her feelings. She indicated that she loved her mother and wanted to see her have a good life, but that her visits with her mother made her feel uncomfortable. She said that even if her foster mother could not adopt her and DHS would have to look

for another place for her, she would still want her mother's parental rights taken away.

Catherine Chaumont, a therapist with the Centers for Youth and Families, testified that T.T. entered the children's residential program at the Arkansas Children's Hospital on June 6, 1994, and that she was initially diagnosed as having shared psychotic disorder for which she was hearing voices and having hallucinations. She described persons diagnosed with shared psychotic disorder as having a close relationship with someone who has a psychotic disorder and exhibiting those psychotic behaviors, which they are exposed to on a regular or long-term basis by the other person. She stated that, initially, T.T. was extremely oppositional and non-compliant, to the extent that she would not follow rules and, at times, she required restraints, physical holds, and closed-door seclusions in order to secure her safety and the safety of the staff and the other children. She indicated that T.T. was extremely fearful of her mother and that, initially, she had been very reluctant to have contact with her mother, even during family therapy sessions. She stated that by October 1995, T.T.'s diagnosis had changed to one of oppositional defiant disorder, a less severe diagnosis, which indicated that she was getting better. She indicated further that the relationship between Appellant and T.T. was improving and that there was a bond between them. She stated that there were, however, times when Appellant appeared to become very agitated by some of T.T.'s questions. In one recent session, when T.T. had continued to press for answers involving verification of her birth, Appellant's tone of voice had escalated and she became short with the child. She stated that recently T.T. had become more aggressive and noncompliant, requiring physical holds on her, which she had not required since she had been discharged from residential treatment in 1994. She stated further that it was apparent that T.T. began decompensating in early February 1996, coinciding with the continuance of the court hearing on the petition to terminate Appellant's parental rights.

Ms. Chaumont ultimately recommended that T.T. be placed for adoption and that Appellant's parental rights be terminated. She indicated that, although Appellant had done everything that had been asked of her by the court, and although her relationship

with T.T. had improved significantly, T.T. still required more than Appellant was able to provide. She stated that T.T. was a "high risk" child and that because of her high needs, Appellant would not be able to maintain the child and keep her stable. She stated that T.T. needed a structured environment and needed parents who would confront her, setting very firm limits on her behavior and being able to enforce those limits by resisting the child's challenges, threats, and verbal abuse. She stated further that when T.T. is around Appellant, she exhibits characteristics of a parentified child, one who assumes the role of acting parent, showing more parenting skills than the mother and sometimes assuming charge of the household. She stated that no amount of training or classes would enable Appellant to meet the needs of T.T. She stated that T.T. needed closure to this situation and that the child was even at the point of trying to recruit potential parents to adopt her.

Gail Brown, Appellant's therapist, testified that Appellant had been diagnosed as being alcohol dependent, having bipolar disorder, and being manic type. She stated that Appellant was at that time undergoing therapy and treatment by medication. She estimated that Appellant had a Global Assessment of Function score of 68, out of a possible 100. She stated that a normal functioning person would score somewhere in the 90s and that a score of 68 would put Appellant at a level of functioning with mild symptoms, some depressed mood or mild insomnia, some difficulty in social, occupational, or school functioning, but generally functioning pretty well and having some meaningful interpersonal relationships. She stated that Appellant would need to continue her therapy and take medication for the rest of her life. When asked if she thought T.T. should be returned to Appellant at that time, she stated that it would be best for Appellant that there be reunification with supervision through a gradual integration, involving visitation overnight and on weekends.

Dr. Nita Brown, a psychiatrist with the Centers for Youth and Families, testified that she had conducted a mental status examination on Appellant at the time T.T. was admitted to the Centers in June 1994. She stated she had observed Appellant having looseness of association, flight of ideas, and bizarre and para-

noid ideation. She stated that while she was conducting the examination, Appellant became increasingly agitated, such that Dr. Brown terminated the session when Appellant physically approached Ms. Chaumont in a threatening manner. She stated that T.T. had expressed some fears of her mother and that the child had indicated that her mother had told her that people were trying to kill her (T.T.) or trying to electrocute her. Pertaining to Appellant's mental condition, Dr. Brown described bipolar disorder as a mood disorder in which a person experiences mental states varying from manic, to psychotic, to depressed. During the manic moods, Dr. Brown stated, the person begins to have poor judgment and can become paranoid and have delusional and bizarre ideas. She stated further that bipolar disorder is a highly variable disease, at times affecting the person's life only minimally, and other times affecting the person to a point where she is totally incapacitated. She stated that T.T.'s emotional requirements are such that she needs an extremely stable environment, which could not be adequately provided by Appellant because the course of the bipolar illness is characterized by ups and downs and by periods of deterioration. She stated further that, in her opinion, no amount of parenting classes or education could enable Appellant to give T.T. the stability she needs.

Appellant testified at the December 8, 1995 hearing that T.T. should be returned to her custody "eventually," after they had more therapy and visitation. She stated that she was asking the court to give her more help and more parenting classes. At the January 26, 1996 hearing, Appellant again expressed a desire to have more therapy before she would be ready to take custody of T.T. She stated that she did not think it was a good idea for T.T. to come home with her at that time. She stated that she felt they needed to spend more time together, perhaps in the form of weekend visits, before she took custody of the child. She stated that she knew what it meant when the therapists referred to T.T. being oppositional and that she would deal with that behavior by taking additional classes. Appellant also indicated that she was not working and that she was currently in a relationship with a man who was an alcoholic and who had not stopped drinking. It was further deduced over the course of the hearings that Appellant had

had several relapses with alcohol, the most recent occurring in October 1995.

In making the determination to terminate Appellant's parental rights, the trial court stated:

> The Court finds that the mother's mental illness was a factor that caused the child to enter foster care. The Court further finds that the mother has had consistant [sic] treatment for her mental illness and will need continued treatment for the rest of her life. The child has had some psychiatric difficulties also and has improved since entering foster care. However, the Court cannot close its eyes to the fact that it must do what is in the best interest of [T.T.] who is entering adolescence, is parentified, and needs a parent or care giver who can be confrontive and set limits, be resistant to challenges, threats, and verbal abuse that this child can exhibit. This child also needs to definitely know what is going to happen in her life. The Court notes that this case had been ongoing and that now is the time to make a permanent plan for the child. Ms. Chaumont, the child's Therapist, testified last week that the child in the past several weeks has become markedly non-compliant and that school grades have plummeted, and that the child needs closure on this issue. *The Court finds that the mother is unable to be the type of parent that this child needs and she is not able to learn how to be that parent.* The Court notes that this is sad because the mother loves the child and has really tried to do what is required, but it has not yet transpired. The Court finds that long-term foster care is not appropriate for this child. This child is adoptable and, according to Ms. Chaumont, is very adoptable. [Emphasis added.]

■ We conclude that the finding of the trial court that Appellant does not have the capacity to be the type of parent T.T. needs was not clearly erroneous, in light of the testimony provided by Catherine Chaumont, Gail Brown, and Dr. Nita Brown, along with Appellant's concession that she was not yet ready to take care of T.T. on a permanent basis. The foregoing evidence demonstrates that the trial court's decision to terminate Appellant's parental rights is supported by clear and convincing evidence and that such decision was in the best interest of the child.

■ Appellant additionally challenges the trial court's ruling on the ground that the court made no finding of her unfitness as a

parent. Appellant relies on *Quilloin v. Walcott*, 434 U.S. 246 (1978), in support of her assertion that there must be a showing of a parent's unfitness before the parental rights may be terminated on the basis of what is in the best interest of the child. While we agree with Appellant that a proceeding to terminate parental rights is a two-step process, requiring the trial court to find (1) the parent unfit and (2) that termination of the parent's rights is in the best interest of the child, we do not agree with her contention that the trial court here did not make a finding that Appellant was unfit. Although the trial court did not actually use the word "unfit," the court clearly made a finding that Appellant was unable to be the type of parent that T.T. needs and that she is not able to learn how to be that parent. We conclude that such a determination by the trial court is a sufficient finding of Appellant's unfitness, and that such finding is supported by clear and convincing evidence.

### Americans with Disabilities Act

For her next point for reversal, Appellant makes two arguments involving the Americans with Disabilities Act ("ADA"). Appellant first argues that she was denied visitation with T.T. on the basis of her mental disability and that reasonable accommodations should have been made by DHS to provide visitation services to her, pursuant to section 9-27-341(b)(2)(E) and the ADA. She next argues that it was error for Dr. Nita Brown to have denied her access to T.T. on the ground that she posed a threat to the child or Ms. Chaumont without first having conducted an individualized assessment of the severity and duration of any risk posed by her. She contends this was also done in violation of the ADA.

The trial court found that DHS had not violated the provisions of the ADA because any denial of visitation was not based on the fact that Appellant had a mental disability, but rather, on the mental and emotional state of T.T. The court stated that Appellant's mental disability was a factor considered by the court, but only to the extent that the disability affected the child in a detrimental way. The court noted that it had in the past issued similar restrictions on visitation in cases where the parents had no identi-

fiable disability, and also, that there had been cases when such restrictions were not necessary and where the parental rights were not terminated even though the parent had a disability such as mental illness.

Appellant has presented no direct authority to support her contention that DHS discriminated against her or failed to provide any services to her or make reasonable accommodations for her. Instead, Appellant merely relies on section 9-27-341(b)(2)(E)(ii), which provides that DHS will make "reasonable accommodations" in accordance with the ADA in order to allow meaningful access to reunification and family preservation services. For the reasons outlined below, we affirm the trial court's ruling.

The ADA provides in pertinent part that, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (1994). Whether an individual has been denied the services of a public entity by reason of the individual's disability is an issue of first impression in this court. We thus look to decisions from other jurisdictions for guidance.

In *In re Torrance P.*, 522 N.W.2d 243 (Wis. Ct. App. 1994), the Wisconsin Court of Appeals determined that the inquiry of whether the father's rights under the ADA had been violated was separate from and unrelated to the issue of whether the trial court erred in terminating the father's parental rights. The court explained that Congress enacted the ADA to eliminate discrimination against persons with disabilities and to create causes of action for those persons, but Congress did not intend to change the obligations imposed by unrelated statutes, such as the Wisconsin statute requiring DHS to make a "diligent effort" to provide court-ordered services to persons involved in an action for termination of parental rights. The court stated that while the father's developmental disability "must be considered in determining the reasonableness of the County's efforts, neither his disability nor the ADA changes the inquiry or the County's burden of proof" under the relevant Wisconsin statute. *Id.* at 245-46. The court con-

cluded that any cause of action the father may have had under the ADA was pursuable under a separate cause of action, but that such a claim could not be the basis for an attack on an order terminating parental rights.

In *In re C.M.*, 526 N.W.2d 562 (Iowa Ct. App. 1994), the Iowa Court of Appeals passed over the issue of whether the ADA could be used as a ground for reversal of an order terminating parental rights. The court ultimately ruled that the issue was procedurally barred because it had not been raised below, although it did address the merits of the claim in the alternative by stating that reasonable accommodations had been made by DHS in that the mother had been provided with a lengthy list of services including those which accommodated her personality disorder.

More recently, in *Stone v. Daviess County Div. Child Servs.*, 656 N.E.2d 824 (Ind. Ct. App. 1995), the Indiana Court of Appeals addressed a situation more closely akin to that in the present case, in that both parents and the children displayed mental, emotional, and psychological problems. The court initially determined that because Indiana statutes did not require that services be provided to *any* parents in proceedings to terminate parental rights, the requirements of the ADA were not applicable. The court nonetheless addressed the merits of the parents' claim because the public entity had, in that case, elected to provide services. In its review of the claim, the court recognized that all that was required under the ADA was that the public entity reasonably accommodate a parent's disability. The court stated that, "[i]n the final analysis, the rights of the parents under the Fourteenth Amendment and the ADA must be subordinated to the protected rights of the children." *Id.* at 831. The court concluded that the services provided to the parents had been sufficiently tailored to meet their disabilities, but that the most significant factor that had not been remedied was the parents' denial that there had ever been any inadequacy in the care of their children. The court thus determined that any additional services would not have cured the parents' denial or their chronic parenting deficiencies.

Section 9-27-341(b)(2)(A) requires a "meaningful effort" by DHS to rehabilitate the home and correct the condi-

tions which caused the removal of the child as dependent-neglected. Subsections (b)(2)(E)(i) & (ii) provide that in the event termination of parental rights is based upon factors which arose subsequent to the original dependency-neglect petition, DHS shall make "reasonable accommodations" in accordance with the ADA to parents with disabilities in order to allow them meaningful access to reunification and family preservation services.

Assuming *arguendo* that the trial court based its decision to terminate Appellant's parental rights on any such subsequent factors, the pertinent inquiry is whether DHS provided "reasonable accommodations" to Appellant to allow her a meaningful access to reunification services. Such accommodations were made in this case, in the form of providing Appellant with a mental evaluation, therapists, and prescribed medication for her mental illness, as well as access to family therapy, parenting classes, Alcoholics Anonymous sessions, transportation, and various casework services. Appellant was additionally provided general visitation with T.T., and was only denied that visitation when it became detrimental to the child. In that respect, we agree with the reasoning espoused by the Indiana Court of Appeals that the parent's rights under the ADA must be subordinated to the protected rights of the child. Such reasoning is consistent with the General Assembly's mandate that all juvenile court proceedings be viewed in terms of what is in the best interest of the child. *See* Ark. Code Ann. § 9-27-102 (Supp. 1995). We thus find no merit to this point.

Similarly, we find no merit to Appellant's second contention that it was error for Dr. Brown to deny her access to her daughter without making an individualized assessment of the risk posed by Appellant. In support of this contention, Appellant relies heavily on *School Bd. of Nassau County v. Arline*, 480 U.S. 273 (1987). That case dealt with the issue of whether a teacher, who had been denied certification because she had tuberculosis, posed a threat to the general public if she were allowed to continue teaching. The Supreme Court held that in order to determine whether a person handicapped by a contagious disease is "otherwise qualified" to do the job, the trial court must conduct an individualized inquiry and make appropriate findings of fact based

upon medical knowledge about the nature, duration, and severity of the risk posed to the general public. The holding in that case is thus inapplicable here because Appellant is not handicapped by a contagious disease and it was not alleged that she posed a threat to the general public. The sole concern here was whether it was in T.T.'s best interest to have contact with her mother at that particular stage in the child's therapy.

We thus conclude that Appellant has failed to demonstrate that her rights pursuant to the ADA were violated by either DHS, Dr. Brown, or the trial court. Appellant was not denied any services on the basis of her mental disability; rather, the trial court's denial of visitation with T.T. was motivated solely by what the court deemed was in the best interest of the emotionally fragile child. We further conclude that even if DHS had failed to make reasonable accommodations for Appellant's disability, such failure would not negate the trial court's decision to terminate Appellant's parental rights.

### Delegation of Judicial Authority

For her last point for reversal, Appellant argues that the trial court erred in allowing the therapists and the minor child to decide whether or not visitation or family therapy would occur. She asserts that the lack of regular visitation with her daughter and the failure to provide family therapy in a timely manner had "dire consequences" for her. Appellant does not attempt to explain what those particular consequences were, nor does she offer any convincing authority or argument in support of reversal on this point, which appears to be little more than an alternative attack on the trial court's decision to deny her visitation with her daughter.

For the reasons discussed in the preceding section, we conclude there was no unlawful delegation of judicial authority by the trial court, as the visitation was only denied during those periods of time that the court and the child's therapists determined such contact would be detrimental to the child. We are persuaded by the trial court's well-reasoned determination that therapists and caseworkers must be allowed some discretion in carrying out the orders of the court in cases where a child's emotional, mental, or

physical health is at stake. Furthermore, because we have determined there was clear and convincing evidence presented indicating that Appellant lacked the capacity or ability to care for T.T., the issue of whether Appellant was denied regular visitation with her daughter is moot.

Affirmed.

THORNTON, J., dissents.

RAY THORNTON, Justice, dissenting. As the majority acknowledges, there is a heavy burden placed upon the party seeking to terminate the parent-child relationship. *Bush v. Dietz*, 284 Ark. 191, 680 S.W.2d 704 (1984). As the United States Supreme Court stated when setting the "clear and convincing" standard of proof in *Santosky v. Kramer*, 455 U.S. 745 (1982), an allegation of parental unfitness must "adequately [convey] to the factfinder [a] level of subjective certainty about [the] factual conclusions . . . since the private interest affected is commanding and the threatened loss is permanent." I respectfully dissent because I do not find that DHS met this burden in showing that J.T. is unable to learn how to be the kind of parent her daughter needs.

The Supreme Court has emphasized that a showing of parental unfitness must be made before the best interest of the child is considered in a parental-termination hearing. *Smith v. Organization of Foster Families*, 431 U.S. 816 (1978). As we pointed out in *Bush v. Dietz*, although the best interest of the child is a matter of primary concern in adoption proceedings, termination of the parental relationship is much more far reaching than a change of custody. Statutes permitting such termination are to be construed in light favoring continuation of rights of natural parents. *Id.* The proof falls short of the statutory and constitutional requirements articulated above. I cannot concur with the decision to uphold the trial court's order of termination under the facts of this case.

Here, the court found that appellant's mental illness was a factor that caused her daughter to enter foster care. The court found that appellant would need continued treatment for the rest of her life, and concluded that, though she had improved, she had not yet become the type of parent her daughter needed, and that

she was unable to become that type of parent. It is generally recognized that termination for mental illness requires that the mentally ill parent is unable to provide proper care for the child and that the inability is likely to continue for the foreseeable future. Ann M. Haralambie, *Handling Child Custody, Abuse, and Adoption Cases*, § 13.13 26 (2d ed. 1993); *State v. Habas*, 299 Or. 177, 700 P.2d 225 (1993); *In re J.N.M*, 655 P.2d 1032 (Okla. 1982); *In re Hime Y.*, 52 N.Y.S.2d 241, 418 N.E.2d 1305 (1981).

As the majority notes, testimony indicated that, even though appellant had done everything required of her, she was not *presently* able to be the type of mother her daughter needs. However, no specific findings were made that appellant's particular problems could not be cured or improved; there was only the bare statement of testimony that "no amount of training or classes would enable J.T. to meet the needs of T.T." As the Oklahoma Supreme Court held in *In re J.N.M.*, "the mere label of mental illness [should not be] allowed to replace an adequate investigation into the effect of the behavior . . . *and the length of time the parents would probably be incapacitated.*" *Id.* at 1036 (emphasis added).

The standard of clear and convincing evidence requires that there be specific proof of "the likelihood of correction or control of the condition" or that "the illness of [the parent] is of such a long term nature and has such a pathological effect on the children that termination is justified under constitutional standards." *Id.*; *see also In re Hime Y., supra.* I do not believe the evidence supports such a finding in this case, and in my view, that lack of evidence is reflected in the conclusion that "J.T. is unable to learn how to be the kind of parent her daughter needs." Here, parental counseling did not begin until after nineteen months of foster care, and the trial court reflected favorably on the improvements made in appellant's parenting skills. The countervailing evidence simply falls far short of the "clear and convincing" standard required by the constitution. *Santosky v. Kramer, supra.* I would reverse and remand.