2012 Ark. App. 502

**Tara WITTIG, Randy Millsap, and Josh Davis, Appellants**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES and Minor Children, Appellees.**

**No. CA 12–294.**

Court of Appeals of Arkansas.

Sept. 19, 2012.

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

Thomas Wilson, for appellant Tara Wittig.

Deborah R. Sallings, Little Rock, Arkansas Public Defender Commission, for appellant Randy Millsap.

Janet Lawrence, for appellant Josh Davis.

Tabitha B. McNulty, Office of Chief Counsel, for appellee.

Chrestman Group, PLLC, by: Keith L. Chrestman, attorney ad litem for minor children.

ROBIN F. WYNNE, Judge.

Tara Wittig, Randy Millsap, and Josh Davis separately appeal from the order of the circuit court terminating their parental rights to their children. We affirm the order of the circuit court as to all three appellants.

This case began on March 5, 2010, when the Arkansas Department of Human Services (DHS or the Department) took a seventy-two-hour hold on four children, T.M. (born December 9, 2001), S.M. (born September 30, 2003), A.M. (born August 10, 2005), and M.D. (born July 12, 2009). Tara Wittig is the mother of all four children. Randy Millsap is the father of T.M., S.M., and A.M. Josh Davis is the father of M.D.

At the time the children were taken into DHS custody, they lived with Tara. The affidavit that accompanied the Department's petition for emergency custody and dependency-neglect stated that the children were inadequately supervised in the home, that there was inadequate food in the home, and that the children reported that they did not want to go home to their mother due to drug use in the home. The Department drug tested Tara and Josh. Tara tested positive for methamphetamine and THC, which is the active substance in marijuana. Josh Davis tested positive for THC.

The circuit court granted DHS emergency custody of the children on March 9, 2010. On March 17, 2010, the circuit court entered an order in which it found probable cause to believe that the children were dependent-neglected. The circuit court entered an order on April 28, 2010, in which it adjudicated the children dependent-neglected due to parental unfitness, inadequate supervision, and failed drug screens by Tara and Josh.

The circuit court kept the children in DHS custody following a review hearing on October 19, 2010. In the resulting order, the circuit court found that Tara had two positive drug screens in March 2010, followed by eight negative drug screens, that she was employed, that she was living in a two-bedroom apartment with Randy Millsap's parents, that she had completed

an inpatient drug program, and that she had completed parenting classes. The circuit court found that Josh Davis had obtained and maintained stable housing, that he was unemployed after leaving the army reserves, that he had two positive drug screens in March 2010, followed by two negative drug screens, and that he had maintained sporadic contact with the Department. There was testimony that Randy was incarcerated and had received a four-year sentence for manufacturing methamphetamine and an additional two-year sentence for failure to appear. The circuit court also found that Randy had provided proof of Narcotics Anonymous meeting attendance, that he had three negative drug screens and that he had not maintained regular contact with the Department. Josh was found to be $900 in arrears on his court-ordered child-support payments, and Randy was found to be $1850 in arrears on his payments.

A permanency-planning hearing was held on August 16, 2011. For reasons that are unexplained, no written order was entered after the hearing. In its termination order, the circuit court attempts to reconstruct the testimony from that hearing. Terri Blanchard, a foster-care supervisor, testified that Tara did not have stable housing, at times the Department was unaware of Tara's whereabouts, and that a man identified as her fiancé would not allow her to give contact information, would not submit to a drug test, and was hostile toward DHS staff at a staffing. Randy was still incarcerated. Josh had stable housing and was employed. However, he had not been consistent with his visitation and continued to have a relationship with Tara. After hearing the testimony, the circuit court changed the goal of the case to termination of parental rights and adoption.

DHS filed a petition for termination of parental rights on October 7, 2011. In the petition, the Department alleged the following grounds in support of termination: (1) that the children had been out of the parent's custody for twelve months and the conditions that led to their removal had not been remedied; (2) that the children had been out of the parent's custody for twelve months and each parent had willfully failed to provide meaningful support or maintain meaningful contact with the children; (3) that other factors arose subsequent to the filing of the petition that demonstrate that return of the children to any parent would be contrary to the children's health, safety, and welfare, and, despite the offer of appropriate ₄services, each parent had manifested the incapacity or indifference to remedy the subsequent issues or factors; and (4) that Randy was sentenced in a criminal proceeding for a period of time that would constitute a substantial period of the children's lives.

At the hearing on DHS's petition, which was held on December 13, 2011, Terry Blanchard testified that Randy was incarcerated on drug-related offenses and that a true finding of sexual abuse on two of his children had been made against him after he was incarcerated. As a result of his incarceration, Randy had no stable housing or employment. Randy had not been compliant with the case plan prior to his incarceration. Josh had stable housing and employment. A visit was made to Josh's home just prior to the hearing, and there was nothing negative to report about the home itself. However, there was a woman living in the home of whom DHS was unaware and on whom no background check had been performed. Josh had not had any positive drug screens since March 2010. During the case, he had been very supportive of the children being returned to Tara, even when she was not making progress and it did not appear feasible to reunite the children with her.

According to Blanchard, Tara had unstable housing and employment. She gave birth to another child during the case, and that child had been privately adopted. Blanchard testified that a man named Terry Jones, whom Tara initially identified as her fiancé, was hostile toward staff during a staffing and refused to submit to a drug screen. Tara later denied that Jones was her fiancé. She also initially told the Department that the two of them lived together, then later insisted that they did not. She brought two other men to visitations with the children. Tara's visits were sporadic, with her attending four visits in the two months ₅prior to August 2011. She failed to appear for visits on several occasions, causing the circuit court to order her to notify DHS regarding whether she would be able to attend.

Blanchard testified that T.M., S.M., and A.M. were doing well in their placements and would be subjected to harm if they were returned to either Tara or Randy. M.D., who was placed separately from the other children, was also doing well in her placement. According to Blanchard, M.D. had a strong bond with her foster parents, who expressed a desire to adopt her. Blanchard expressed concerns regarding Josh's relationship with Tara, his ability to care for M.D., his lack of stability, and the recently discovered live-in girlfriend.

Amanda Thompson, a family-service worker who was assigned to the case in October 2011, testified that she had conducted home visits with both Tara and Josh but had no contact with Randy. Josh lived in a two-bedroom apartment that had a room set up for M.D. Thompson had no concerns with Josh's housing apart from the fact that his girlfriend of four months moved in one-and-a-half weeks prior to the termination hearing. Josh had regularly

attended visitation since April 16, 2011. Josh's visits were not detrimental to M.D.; however, he had not progressed to the point of a sixty-day trial placement. Tara lived in a one-bedroom apartment that had a small mini-fridge and one bed consisting of two mattresses on the floor with no room set up for the children. Tara had been in this apartment since August 22, 2011. Prior to that, there were several different addresses listed for Tara. Thompson testified that Tara's housing was inadequate and that she made inappropriate decisions regarding cohabitation. Thompson testified that all of the children are adoptable.

Tara testified that she had lived in the same apartment for the previous sixteen months,[6] with the exception of a two-month period during which she lived with Randy's parents. Tara stated that she had the option to "retrofit" her apartment to accommodate the children by knocking out a wall that separated her apartment from an adjoining one. She testified that she had worked at a uniform-cleaning service for the previous month. Before that, she worked for B.A. Burrito for three-and-a-half months and was unemployed for six months. She claimed that it was the visitation with her children that caused her to be unable to find employment. She denied any drug use and also denied that she was cohabitating. According to Tara, she broke up with her fiancé, whom she identified as Lee Hanson, got pregnant by another man, and then resumed her relationship with Hanson.

Randy testified that he had been incarcerated since August 2010 for manufacturing methamphetamine. He manufactured the methamphetamine in Tara's government-assisted housing and, as a result, she is no longer eligible for such housing. He testified that his earliest release date would be November 2012. Randy denied abusing any of his children. He stated that he had not received any services during his incarceration and that he had written two letters to the children during that time.

Josh testified that he had lived in his apartment for three months. He stated that he had been employed for all but one month since March 2010 in four separate jobs. He claimed that his girlfriend neither uses drugs nor has a criminal record and that he would choose M.D. over her. The children's attorney ad litem introduced an affidavit showing that Josh had paid a total of $186.40 in child support since the case opened and owed $2,657.60 in unpaid child support. Josh claimed that he did not pay child support in 2011 because he was saving the[7] money to buy things for M.D. when she came home.

The circuit court filed an order granting DHS's petition to terminate parental rights on January 19, 2012. This appeal followed.

We review termination of parental rights cases de novo. *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001). Termination of parental rights is an extreme remedy and in derogation of the natural rights of parents, but parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Id.* Grounds for termination of parental rights must be proved by clear and convincing evidence. *Camarillo–Cox v. Ark. Dep't of Human Servs.*, 360 Ark. 340, 201 S.W.3d 391 (2005); *M.T. v. Ark. Dep't of Human Servs.*, 58 Ark.App. 302, 952 S.W.2d 177 (1997). It must also be proved that termination of parental rights is in the children's best interest. *Smith v. Ark. Dep't of Health & Human Servs.*, 100 Ark.App. 74, 264 S.W.3d 559 (2007). Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm

conviction as to the allegation sought to be established. *Anderson v. Douglas*, 310 Ark. 633, 839 S.W.2d 196 (1992). When the burden of proving a disputed fact is by clear and convincing evidence, the appellate inquiry is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *J.T. v. Ark. Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997). We give due regard to the opportunity of the trial court to judge the credibility of the witnesses. *Id.* Where there are inconsistencies in the testimony presented at a termination hearing, the resolution of those inconsistencies is best left to the trial judge, who heard and observed those witnesses first-hand. *Dinkins, supra.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.*

### Tara

In her argument, Tara asserts that several of the findings by the circuit court that pertain to both the grounds for termination and the court's conclusion that the children would be subjected to potential harm if returned to her are in error. In its order terminating her parental rights, the circuit court found that DHS proved that she failed to provide meaningful support or maintain meaningful contact with the children. The court further found that she failed to remedy factors that arose subsequent to the filing of the petition because she had not maintained stable housing or sufficient income; in the twenty-one months the children had been in the Department's custody, she had not progressed to the point of a sixty-day trial placement; and she demonstrated poor judgment in her relationships.

Tara argues that the circuit court's finding that she lacked stable housing is not supported by the evidence. She asserts in her brief that Blanchard testified at the hearing that she had stable housing. What that witness actually said in her testimony was that while Tara had housing, she would not classify it as stable housing. Thompson testified that the apartment consisted of one bedroom, a living area, and a kitchen with a minifridge and that it would not be adequate for Tara and the children. Tara points to her testimony that she could acquire more room by knocking down a wall. However, she is renting this apartment and there was no proof that the property owner would allow this to happen. As of the date of the hearing, the only housing Tara had was inadequate to meet the children's basic needs. Tara also disagrees with the court's finding that she lacked sufficient income. The testimony at the hearing was that she had a "spotty" work history, including six months of unemployment, and that she had been at her current job for only one month at the time of the hearing.

Tara also takes issue with the circuit court's finding that she failed to provide sufficient support or maintain meaningful contact with the children. There was no testimony at the termination hearing regarding Tara's compliance with any child-support obligation. There was, however, testimony regarding her contact with the children. The Department submitted testimony that Tara's visitation with the children was sporadic and that her failure to attend visitations was disruptive to the children to the extent that the circuit court ordered her to advise DHS in advance as to whether she would attend visitation. We hold that the circuit court's determination that the Department proved at least one statutory ground for termination is not clearly erroneous.

We further hold that the circuit court's finding that termination of Tara's parental rights was in the children's best interest is not clearly erroneous. Factors to consider in determining best interest are the likelihood of adoption and potential harm caused by returning the child to the custody of the parent. *Gossett v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 240, 374 S.W.3d 205. She does not argue that the children are not adoptable. As for the potential-harm factor, DHS submitted evidence that Tara did not regularly visit the children. The Department also submitted evidence that Tara's housing was inadequate for the children and that her employment status and history indicated a genuine concern regarding her ability to adequately care for four children. We affirm the circuit court's termination of Tara's parental rights.

### Randy

In his brief, Randy argues that DHS failed to prove at least one statutory ground for termination. In the termination order, the circuit court found that DHS proved that Randy willfully failed to provide significant material support or maintain meaningful contact with the children, that Randy failed to remedy factors that arose subsequent to the filing of the petition, despite a reasonable offer of services, and that Randy was incarcerated for a period of time that would constitute a substantial portion of the children's lives.

The appropriate inquiry where a parent has been ordered to comply with a court's reunification orders and is incarcerated is whether the parent utilized those resources available to maintain a close relationship with the children. *Malone v. Ark. Dep't of Human Servs.*, 71 Ark.App. 441, 448, 30 S.W.3d 758, 762 (2000). Randy argues that he could not maintain contact with his children while he was incarcerated because they were never brought to see him. Randy's argument ignores the evidence that he saw them only four times in the four months prior to his arrest and the fact that in the months that followed he testified that his only attempt at any contact with the children was two letters that he had written. There is no indication that Randy requested that he be allowed to see his children or that he took advantage of whatever opportunities to have contact with his children that would have been available to him in prison. He is correct that the Department did not produce evidence at the termination hearing that he had failed to provide support. However, the ground found by the circuit court is satisfied with either lack of support or lack of meaningful contact. We hold that the circuit court's finding that the Department proved that Randy failed to maintain meaningful contact with the children is not clearly erroneous. Because DHS is required to prove only one statutory ground for termination, Arkansas Code Annotated section 9–27–341(b)(3)(B) (Supp. 2011), it is not necessary for us to consider Randy's remaining arguments. We affirm the circuit court's termination of Randy's parental rights.

### Josh

Josh does not argue that the Department failed to prove a ground for termination; instead, he argues that the circuit court's finding that termination of his parental rights to M.D. was in her best interest is clearly erroneous. Josh does not challenge the circuit court's finding that M.D. is adoptable. Therefore, we are left to examine whether the circuit court's finding that returning M.D. to Josh would subject her to potential harm is clearly erroneous. We hold that it is not. Although Josh did visit M.D. regularly after the case was a year old, he never progress-

ed to the point of a trial placement or overnight visits and never requested any such visitation. The testimony at the termination hearing was that M.D., who was three years old, was very bonded to her foster parents. It would be reasonable to conclude that removing her from that environment to live with a man who willingly had the bare minimum of contact with her would subject M.D. to harm.

M.D. was in foster care for almost two years prior to the termination hearing and Josh made exactly two child-support payments, totaling less than $200. When asked about this, he said that he thought it would be better for him to spend the money on her. This evidence |₁₂could justifiably raise doubts regarding Josh's willingness to support his daughter if she were returned to him.

In addition to the lack of payment of child support, there is the evidence presented at the termination hearing of very questionable judgment by Josh. Josh supported returning M.D. to Tara despite the fact that Tara is unfit to raise the girl and was continually found to be unfit during the case. Furthermore, Josh believed it was appropriate to have a girlfriend of only four months come to live with him a week before the termination hearing and not notify the Department that she was living there. We affirm the circuit court's termination of Josh's parental rights.

Affirmed.

HART and GRUBER, JJ., agree.