PHILLIP T. WHITEAKER, Judge
William Norris appeals the order of the Faulkner County Circuit Court that terminated his parental rights to his daughter, A.F. Norris challenges both the statutory grounds supporting the decision to terminate his parental rights and the potential-harm finding that informed the court's best-interest conclusion. We find no error and affirm.
*863 I. Background and Procedural History
A.F. was born in October 2016 with methamphetamine in her system. The Arkansas Department of Human Services (DHS) filed a petition for emergency custody and dependency-neglect removing A.F. from the custody of her mother, Jessica McCoy.[1] At the time of A.F.'s birth, Jessica was married to Joshua McCoy; therefore, both Jessica and Joshua were named as A.F.'s legal parents on the petition although A.F.'s biological father was unknown at the time.[2] The court entered an ex parte order for emergency custody, a probable-cause order, and in November 2016, an adjudication order finding A.F. dependent-neglected. In the adjudication order, the court noted that it accepted the parties' stipulation that the allegations in the ex parte petition and accompanying affidavit were true and stating as well that this was a "Garrett's Law" case. The adjudication order reflected that the parties were Jessica McCoy as the mother, Joshua McCoy as the legal father, and Zachery Free as the putative father. Norris was not a party at the time of adjudication.
In February 2017, the circuit court, acting on information that Norris might be A.F.'s biological father, issued an order for DNA testing to determine parentage. The DNA test revealed that Norris is A.F.'s biological father. Accordingly, by order entered on May 9, 2017, the court added Norris as a party, ordered Norris to comply with the case plan and court orders, and ordered DHS to conduct a home study on Norris and his mother. By this time, A.F. was seven months old.
After being determined to be A.F.'s biological father, Norris was also permitted to begin visitation with her, and he participated in the review-hearing process, attending a review hearing in July 2017. The court's subsequent review order noted that Norris had visited with A.F. for two hours on March 28 and two hours on May 24. In addition to his participation with visitation, the court found that Norris was employed and had partially complied with the case plan. Because Norris tested positive for THC, the court ordered Norris to submit to a drug-and-alcohol assessment. The court further ordered him to take steps to resolve issues with his driver's license, complete the paperwork necessary to complete his home study, and comply with the case plan and court orders. DHS was concomitantly ordered to complete the home study, arrange Norris's drug-and-alcohol assessment, and provide him assistance with transportation. The court determined that the goal of reunification was still appropriate for A.F., but the concurrent goal of adoption was also appropriate.
At a permanency-planning hearing in October 2017, the court determined that the goal of the case should be adoption because "neither parent has made significant measurable progress that would justify continuing with [the] goal [of reunification]." With respect to Norris, the court found that he had failed to comply with the case plan and court orders in that he had failed to maintain meaningful contact with DHS; he had failed to complete the paperwork to have a home study performed on his residence; and he had visited with A.F. only three times since March of that year. The court did allow Norris to continue having visitation, although it changed the goal of the case to adoption.
*864 DHS filed its petition for termination of parental rights as to Norris and the McCoys in November 2017.[3] As to Norris, DHS pled five separate grounds for termination.[4] After a hearing on the petition, the circuit court found that DHS had proved the statutory grounds necessary for termination. Specifically, the court found that DHS had proved three grounds: the "twelve-month failure to support or communicate" ground, abandonment, and aggravated circumstances by abandonment. The court also found, based on the caseworker's testimony that A.F.'s foster parents wished to adopt her, that A.F. was adoptable. Finally, the court found that Norris's "lack of involvement and visitation with [A.F.] demonstrate[s] how [A.F.] would be at risk of potential harm if returned" to Norris. The circuit court entered an order and a subsequent amended order terminating Norris's parental rights.[5] Norris filed a timely notice of appeal, and he now challenges the circuit court's findings regarding the statutory grounds and the potential-harm prong of its best-interest analysis.
II. Standard of Review
On appeal, we review termination-of-parental-rights cases de novo but will not reverse the circuit court's ruling unless its findings are clearly erroneous. Dade v. Ark. Dep't of Human Servs. , 2016 Ark. App. 443, 503 S.W.3d 96. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. Id. In determining whether a finding is clearly erroneous, we have noted that in matters involving the welfare of young children, we will give great weight to the trial judge's personal observations. Jackson v. Ark. Dep't of Human Servs. , 2016 Ark. App. 440, 503 S.W.3d 122.
Our case law recognizes that the termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents. Fox v. Ark. Dep't of Human Servs. , 2014 Ark. App. 666, 448 S.W.3d 735. In termination-of-parental-rights matters, the circuit court is required to follow a two-step process by finding first that the parent is unfit and second that termination is in the best interest of the child. T.J. v. Ark. Dep't of Human Servs. , 329 Ark. 243, 947 S.W.2d 761 (1997) ; Smith v. Ark. Dep't of Human Servs. , 2013 Ark. App. 753, 431 S.W.3d 364. The first step requires proof of one or more of the statutory grounds for termination. Ark. Code Ann. § 9-27-341(b)(3)(B). The second step requires consideration of whether the termination of *865 parental rights is in the child's best interest. Ark. Code Ann. § 9-27-341(b)(3)(A). As a result, DHS bears a heavy burden in seeking to terminate the relationship of parent and child. Fox, supra.
III. Statutory Grounds
We first address Norris's challenge to the sufficiency of the evidence supporting the statutory grounds found to exist by the circuit court. The circuit court found that Norris abandoned A.F. See Ark. Code Ann. § 9-27-341(b)(3)(B)(iv). "Abandonment" is defined in Arkansas Code Annotated section 9-27-303(2)(A) as follows:
(i) The failure of the parent to provide reasonable support for a juvenile and to maintain regular contact with a juvenile through statement or contact when the failure is accompanied by an intention on the part of the parent to permit the condition to continue for an indefinite period in the future;
(ii) The failure of a parent to support or maintain regular contact with a child without just cause; or
(iii) An articulated intent to forego parental responsibility.
We now consider the evidence that supports termination of Norris's parental rights on this ground.
The court heard evidence from both DHS and Norris concerning his sporadic visitation with A.F. Before the permanency-planning order was entered, Norris had limited contact with A.F. After the DNA test showed Norris to be A.F.'s father, he requested a visit, which DHS accommodated in March 2017. Over the next few months, Norris visited only two more times, on May 24 and September 11. In all, Norris exercised only three visitations with A.F. during 2017. After DHS filed the petition to terminate his rights, Norris did exercise three visits in January 2018. He conceded, however, that he did not step up his visitations with A.F. until after his attorney told him that he needed to make more visits; in fact, he expressly testified that he was "told it would look better if I came and visited more often." In all, Norris had only six visits with his daughter, and during her life he had spent no more than twelve hours with her.
Norris ascribed his lack of contact to the 170-mile distance between Texarkana, where he lived, and Conway, where A.F. resided. He described his work schedule, saying he worked as a mechanic from eight to five Monday through Friday and seven to noon on Saturdays. He also addressed his visitations with A.F. in the context of his work schedule, saying it was hard to take off work and get back and forth from Texarkana and that his job kept him so busy that he could not take time off. He also conceded, however, that "other than being busy at work, there aren't any other reasons that I wasn't able to see my daughter more." In addition to this evidence, the court also heard that DHS had offered Norris gas cards to help with transportation and was also willing to provide him with rides to and from Conway to facilitate visitation. In fact, caseworker Latifa Jones testified that if Norris "either had a different work schedule or, for whatever reason, if he had wanted to come to more visits, attend weekly, attend every other week, oh, yes, I was willing to offer that service. If we had to do the visits in the early evening, that is something that I was willing to do. I was pretty open with him as far as allowing him to visit her." Another caseworker, Holli Harrington, noted that Norris had gone to court in Faulkner County in May and July, but he did not request a visit with A.F. either time. Norris acknowledged that he did not exercise the opportunity to visit with A.F. on his previous court-hearing dates because he "wasn't ever told that [he] could *866 have a visit after court in Conway, so ... it never crossed [his] mind to request to see her."
The court also heard evidence from both DHS and Norris concerning his failure to cooperate with the conducting of a home study. After being identified as A.F.'s father, Norris was provided with appropriate paperwork for the completion of a home study. DHS told him how important it was to complete the forms in a timely manner. Despite this instruction, Norris failed to correctly complete the necessary paperwork until November, several months after he had received the paperwork.[6] Despite having completed the home-study paperwork, however, Norris never completed the forms necessary to conduct a background check, and the home study therefore remained incomplete.
The evidence presented in this case was sufficient to support a conclusion that Norris failed to support or maintain regular contact with his child without just cause. See Ark. Code Ann. § 9-27-303(2)(A)(ii). By his own testimony, Norris attended only three visits in 2017. Although it was uncontroverted that the distance between Texarkana and Conway and Norris's work schedule made visitation difficult most days of the week, Norris offered no excuse for not attempting to exercise visitation on two other occasions when he was already in Conway for a court hearing other than "it did not occur to him." He also did not refute DHS's testimony concerning its willingness to accommodate his schedule. While he did exercise three visits in January 2018, he admitted that he did so only after his lawyer told him "it would look better for him." Moreover, those three visits in January took place after the permanency-planning order had been entered. A parent's overtures toward participating in the case plan or following the orders of the court following the permanency-planning hearing and preceding the termination-of-parental rights hearing is an insufficient reason to not terminate parental rights. Ark. Code Ann. § 9-27-341(a)(4)(A). Here, Norris did not begin to take an active role in the case until the eleventh hour. This court has repeatedly held that a child's need for permanency and stability will override a parent's eleventh-hour efforts. Gonzalez v. Ark. Dep't of Human Servs. , 2018 Ark. App. 425, 555 S.W.3d 915 ; Burleson v. Ark. Dep't of Human Servs. , 2017 Ark. App. 616, 535 S.W.3d 655.
Although Norris raises arguments as to both the lack-of-meaningful-contact ground and the aggravated-circumstances-by-abandonment ground found to exist by the circuit court, only one ground is necessary to support a circuit court's decision to terminate parental rights. Harley v. Ark. Dep't of Human Servs. , 2018 Ark. App. 428, 556 S.W.3d 544 ; Harjo v. Ark.Dep't of Human Servs. , 2018 Ark. App. 268, 548 S.W.3d 865. Unlike the lack-of-meaningful-contact ground, the termination statute does not require that the abandonment last for any particular length of time. L.W. v. Ark. Dep't of Human Servs. , 2011 Ark. App. 44, 380 S.W.3d 489. Accordingly, we affirm the circuit court's finding that DHS proved the statutory ground of abandonment.
IV. Best Interest
Norris also challenges the circuit court's finding that termination of his parental *867 rights was in A.F.'s best interest. He does not challenge the evidence pertaining to the adoptability of A.F. Instead, he focuses on whether there was sufficient evidence of the potential harm that A.F. would face if returned to him.
The circuit court found that there was a likelihood of harm in giving custody of A.F. to Norris. The court reasoned that Norris "had in no way assumed any parental responsibility for the child and for the court to sit here and think that it would be wise or good to return the child to a gentleman that has failed to live up to the barest and minimum of being a responsible parent would be absurd."
On appeal, Norris contends that the evidence was insufficient to support the potential-harm finding. He argues that the only evidence of potential harm offered by DHS was that there was a lack of a bond between him and A.F. He suggests that this concern regarding potential harm was due not to his lack of interest, but to DHS's "lack of desire ... to truly work towards placing A.F. with her father." He urges that it is "ridiculous to base [his] entire ability to parent on his visitation schedule knowing the long distance between [him] and A.F.'s placement." He also notes that there was no evidence that either he or his home was inappropriate or that he posed any risk to her. Finally, citing Ellis v. Arkansas Department of Human Services , 2016 Ark. 441, 505 S.W.3d 678, he insists it was error for the circuit court to elevate the bond of the child with the foster family over the public policy of Arkansas to strengthen family bonds. We find these arguments unavailing.
At the termination hearing, DHS expressed concern about the lack of a bond between Norris and A.F. Specifically, caseworker Harrington testified about the potential harm in returning A.F. to Norris: "I think we have to look at the bond that a child has to their parent/caregiver." This "lack of bond" was not the only evidence offered by DHS or considered by the court in assessing potential harm. Harrington also testified about Norris's failure to "step up to the plate regarding what is needed in order to be a parent and to care for a child and to ensure that their health, safety, well-being is met." As examples of the failure to "step up to the plate," we note that the court heard evidence of Norris's failure to complete the requirements for possible home-study placement, his failure to visit A.F. on her birthday or at Christmas, and his minimal effort of sending only a small package of diapers and wipes to A.F.'s foster parents at the January 2018 visit.
Even if the "lack of bond" was the only evidence on which the potential-harm finding was based, DHS responds that the circuit court correctly found the potential for harm in the lack of a bond between Norris and A.F. Citing numerous cases, DHS argues that a lack of a bond between parent and child, as well as the existence of a bond between the child and the foster family, can properly inform a circuit court's potential-harm finding. See, e.g. , Fraser v. Ark. Dep't of Human Servs. , 2018 Ark. App. 395, at 10, 557 S.W.3d 886 (affirming termination when father and child had "no relationship" and "no bond"); Brumley v. Ark. Dep't of Human Servs. , 2015 Ark. App. 90, 455 S.W.3d 347 (when father had no relationship with his child and the child had bonded to his foster family, termination was upheld); Wittig v. Ark. Dep't of Human Servs. , 2012 Ark. App. 502, at 11, 423 S.W.3d 143, 150-51 (affirming termination because father did not begin to visit regularly with his daughter until after the case was a year old, he never progressed to the point of a trial placement or overnight visits, he never *868 requested any such visitation, and the child was very bonded to her foster parents; this court held that "[i]t would be reasonable to conclude that removing her from that environment to live with a man who willingly had the bare minimum of contact with her would subject [the child] to harm").
Moreover, in considering potential harm caused by returning the child to the parent, the circuit court is not required to find that actual harm would result or affirmatively identify a potential harm. Gulley v. Ark. Dep't of Human Servs. , 2016 Ark. App. 367, 498 S.W.3d 754 ; Welch v. Ark. Dep't of Human Servs. , 2010 Ark. App. 798, 378 S.W.3d 290. Potential harm must be viewed in a forward-looking manner and in broad terms, including the harm the child suffers from the lack of stability the child receives in a permanent home. McNeer v. Ark. Dep't of Human Servs. , 2017 Ark. App. 512, 529 S.W.3d 269 ; Collins v. Ark. Dep't of Human Servs. , 2013 Ark. App. 90, 2013 WL 546940. This court has repeatedly held that the potential-harm factor does not require that a specific potential harm be proved by clear and convincing evidence. Edgar v. Ark. Dep't of Human Servs. , 2017 Ark. App. 312, at 11, 522 S.W.3d 127, 135 ; Pine v. Ark. Dep't of Human Servs. , 2010 Ark. App. 781, 379 S.W.3d 703. Additionally, the risk for potential harm is but a factor for the court to consider in its analysis. Porter v. Ark. Dep't of Human Servs. , 2013 Ark. App. 299, at 8, 427 S.W.3d 738, 742.
Here, the circuit court gave thorough consideration to this specific factor and even allowed the parties time to brief the issue after the termination hearing. In addition, the court had the opportunity to observe and listen to Norris's testimony and glean from his demeanor whether he possessed the necessary attitude to be an active and attentive father-that is, the ability to bond with his daughter. It is well settled that in deciding whether a circuit court's termination decision is clearly erroneous, we defer to the superior opportunity of the circuit court to observe the parties and to judge the credibility of witnesses. Williams v. Ark. Dep't of Human Servs. , 2015 Ark. App. 171, 458 S.W.3d 271. Affording the circuit court that deference in this case, we cannot say that the court's potential-harm finding was clearly erroneous.
Affirmed.
Vaught and Murphy, JJ., agree.

Jessica executed a consent to the termination of her parental rights to A.F. at the beginning of the termination hearing in this case, and she is not a party to this appeal.

The affidavit in support of the petition noted that Jessica's current boyfriend, Zachery Free, was not believed to be A.F.'s biological father, although she shared his last name.

Zachery Free had been dismissed as a party by that time.

DHS alleged the following grounds: (1) twelve-month failure to remedy, Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(b) (Supp. 2017); (2) twelve-month failure to provide significant material support in accordance with the parent's means or to maintain meaningful contact, Ark. Code Ann. § 9-27-341(b)(3)(B)(ii)(a) ; (3) abandonment, Ark. Code Ann. § 9-27-341(b)(3)(B)(iv) ; (4) other subsequent factors, Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(a) ; and (5) aggravated circumstances, Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)(a)(3) , (5) .

At the hearing, the court found that the "twelve-month failure to remedy" ground had been proved, and this finding was reflected in the court's first termination order. The court subsequently entered an amended order striking that finding, admitting that it had been erroneously included in the initial order and that the decision was wrong pursuant to Earls v. Arkansas Department of Human Services , 2017 Ark. 171, 518 S.W.3d 81 (holding that the "clock" on the twelve-month failure-to-remedy ground cannot begin to run until paternity has been established).

The purported delays in receiving the home study included one set of papers that had to be redone because it was over thirty days and "out of date." Another delay was because Norris had moved to the Texas side of Texarkana, necessitating a home study pursuant to the Interstate Compact on the Placement of Children (ICPC). Eventually, however, Norris's home study indicated that his home was appropriate for the child.