v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES and Minor Child, Appellees.**

**No. CA 10–890.**

Court of Appeals of Arkansas.

Jan. 19, 2011.

490

Leah Lanford, Little Rock, for appellant.

Tabitha Baertels McNulty, Little Rock, Keith L. Crestman, Jonesboro, for appellee.

WAYMOND M. BROWN, Judge.

L.W.[1] brings this appeal from the order of the Pulaski County Circuit Court terminating her parental rights to her son, L.K.W.[2] Appellant argues that there is insufficient evidence to support the circuit court's findings as to both grounds for termination and whether the termination is in her son's best interest. We affirm.

The case began in March 2007, when appellant was placed in the custody of the Department of Human Services after she was neglected by her mother. At the age of sixteen and while in foster care, appellant became pregnant and gave birth to her son on January 30, 2009. On that same date, DHS placed an emergency hold on L.K.W., alleging that he was a dependent juvenile because appellant was a minor in the state's custody. The court entered an order granting the department's petition for emergency custody. Probable cause was later found for entry of the emergency order.

At the April 28, 2009 adjudication hearing, the court found that L.K.W. was dependent. The goal of the case plan was reunification. Appellant and her son were placed together in foster care. Appellant was ordered to attend school regularly, attend parenting classes and individual counseling, submit to a psychological evaluation and follow the recommendations, and submit to random drug and alcohol screens. The court also noted that, at some point, appellant would be required to obtain and maintain stable employment and housing.

Appellant did not appear at the September 22, 2009 review hearing. The goal of the case plan was changed to termination of appellant's parental rights due to the fact that appellant ran away from foster care in May 2009. The court found that appellant was not in compliance with the court's orders. Appellant was also found to have indicated that she did not want the responsibility of raising her son. The order also suggested that appellant may have abandoned L.K.W.

1. Appellant attained her majority in August 2010, while this appeal was pending.

2. The circuit court also terminated the parental rights of L.K.W.'s putative father. That disposition is not relevant to this appeal.

DHS filed its petition seeking the termination of appellant's parental rights on November 20, 2009. The petition alleged a single ground for termination—that appellant had |₃been found by a court to have abandoned an infant.[3]

After a December 22, 2009 hearing, the court found that the goal of the case plan should be reunification and dismissed the petition for termination. The court did not discount the possibility that appellant abandoned her son when she ran from foster care but intended to give appellant a full year to work toward reunification. The court made specific findings that appellant abandoned L.K.W. and subjected him to aggravated circumstances by fleeing from foster care. The court later amended its order to change the goal to termination of appellant's parental rights and adoption of L.K.W.

DHS filed its second petition seeking the termination of appellant's parental rights on February 12, 2010. The petition alleged two grounds for termination: the "twelve-month failure to remedy" ground[4] and the "aggravated circumstances" ground.[5]

The case proceeded to a termination hearing that began on March 16, 2010, and was continued on March 22, 2010. Fritzi Hemphill, appellant's therapist, testified that she received |₄a referral from DHS about appellant in early January 2010 and her first session with appellant occurred on March 2, 2010. She said that appellant

was actually suspended from school on the day of one of the sessions because of terroristic threatening and that appellant had other disciplinary problems at school. She reported that appellant's cousin and legal guardian, Pamela Hutcherson, was concerned about appellant's depression and that she assisted Hutcherson with a referral to a mental-health facility for an assessment. According to Hemphill, appellant likely suffered from reactive-attachment disorder, which involves a lengthy treatment that is determined, in large part, by the patient. While Hemphill noted that substantial progress could be made within three months, she also noted that there could be significant attachment issues if L.K.W. were raised by appellant.

Hemphill was not certain that appellant's reactive-attachment disorder had been addressed. She also believed that appellant was in emotional pain stemming from several possible sources, including her present depression or unresolved childhood issues. Hemphill was willing to work on all of these issues with appellant. Although appellant had indicated that she wanted to reunify with L.K.W., Hemphill could not assess appellant's capacity to parent her child until after appellant had been in therapy for a longer period. The therapist also disagreed with Dr. Paul Deyoub's recommendation to terminate parental rights because appellant had not had the opportunity to address her disor-

---

**3.** *See* Ark.Code Ann. § 9–27–341(b)(3)(B)(ix)(*a*)(*5*). The statute refers to the definition of "abandonment" found in section 9–27–303(2). That section defines "abandonment" as follows:

 (A) Failure of the parent to provide reasonable support and to maintain regular contact with a juvenile through statement or contact when the failure is accompanied by an intention on the part of the parent to permit the condition to continue for an indefinite period in the future and support or maintain regular contact with a juvenile without just cause; or

 (B) An articulated intent to forego parental responsibility[.]

**4.** *See* Ark.Code Ann. § 9–27–341(b)(3)(B)(i)(*a*).

**5.** *See* Ark.Code Ann. § 9–27–341(b)(3)(B)(ix)(*a*)(*3*).

der with therapy. She also suggested that appellant may benefit from a teen-parenting program.

Dr. Paul Deyoub, a forensic psychologist, testified that he conducted a psychological evaluation of appellant. His evaluation disclosed concerns about appellant's ability to parent, including the fact that appellant was still a minor, that she was lower functioning with an IQ of 76, that she was depressed, and that she had disruptive behavior disorder. He also said that appellant was detached from L.K.W. as she had been from her own parent and guardian. Deyoub said that his report recommended that appellant's parental rights be terminated because he did not see any basis for appellant being able to parent. He added that it might be different if the court wanted to see how appellant matured from ages eighteen to twenty and reassess at that point.

According to Deyoub, his report addressed appellant's reactive-attachment disorder without calling it that by name. Deyoub explained that part of the reason why he saw such a poor prognosis for appellant was that she had lived in what he called a "laboratory experiment" with L.K.W. where she could see how the foster parent provided for appellant and L.K.W. Appellant's 76 IQ also complicates her ability to benefit from therapy, according to Deyoub. He said that appellant's reason for running away from foster care was that she was not comfortable being a parent and just left. As to the prognosis of appellant being able to live independently and care for L.K.W., Deyoub did not foresee that happening in less than two years from the time appellant turned eighteen. He added that if appellant remained in the custody of a stable relative for the next year, that would be an alternative to the termination of appellant's parental rights, calling it another year of foster care.

DHS caseworker Danyetta Pride testified that the department was recommending that appellant's parental rights be terminated on the basis that appellant had not fully complied with the court's orders. According to Pride, appellant was ordered to attend school, take her education seriously, and attend counseling, which she had not done because of her suspensions from school. Pride also called appellant's failure to abide by her cousin's rules another problem. When appellant ran away from foster care, the foster parent wanted L.K.W. removed to another home where he could receive all the attention he needed. According to Pride, appellant left foster care in December 2009, when she was placed in the legal custody of her cousin. She said that it was believed that appellant would do better with family; however, there had been no progress since that time.

On cross-examination, Pride said that it was in L.K.W.'s best interest for appellant's parental rights to be terminated so that he could be adopted into a permanent home. She added that she did not think appellant was capable of providing that to L.K.W. in the near future. She admitted that L.K.W. was taken into DHS's custody solely because appellant was a minor and that there were no allegations of abuse or neglect against appellant. Pride also acknowledged that appellant had completed parenting classes. She said that appellant visited with L.K.W. "every chance she gets" and that she was attentive to his needs. According to Pride, appellant had been cooperative with her.

Adoption specialist Lisa Saulsberry testified that L.K.W. was adoptable. She had identified twenty-six families that matched L.K.W.'s characteristics of age, race, and sex.

Betty Lovelace, the foster parent for appellant and L.K.W., testified that appel-

lant took care of L.K.W. when they were in Lovelace's home. She said that her only problem with appellant was that appellant would skip school.

Appellant testified that she was in foster care with L.K.W. from the time L.K.W. was born until she ran away in May 2009. She returned to foster care in October 2009 and remained there until December 2009, when she was placed in the legal custody of her cousin, Pamela Hutcherson. She added that she had been in Pinnacle Pointe, a behavioral center, where she was being treated with medication for depression. According to appellant, she had been suspended from school four times during the current school year.

On cross-examination, appellant said that she returned to foster care because she was caught shoplifting. She explained that she had posted that she was scared to be a mom on the Internet. Appellant acknowledged that there were two charges pending against her—a terroristic threatening charge and a disorderly conduct charge—that were filed within the past two weeks. Appellant did not believe that she was financially able to care for her son, but she stated that she did love him. According to appellant, she thought that her therapy sessions with Fritzi Hemphill could help. She asserted that she took primary care of her son when the two of them were together in foster care. She added that she wanted to be involved in his life and care for him. She had completed parenting classes. According to appellant, her medication (Prozac) had made a difference in the five days that she had been on it, and she no longer felt depressed. She did not want her parental rights terminated and said that she deserved more time to reunify because she loved her son. Appellant said that she would continue with her therapy and her medication.

Pamela Hutcherson, appellant's cousin, testified that appellant had been living with her since December 22, 2009. She said that she had been trying to help appellant, but appellant did not want to follow her rules, which was having an impact on Hutcherson's twelve-year-old daughter. She described appellant's actions as beyond behavioral problems, adding that she had not seen this behavior with her own children. Hutcherson said that she was fed up with appellant because she was having to take time away from her own children to deal with appellant. She said that she had told appellant that she was going to be returned to DHS's custody.

The circuit court ruled from the bench and granted the department's petition. The court's written order, entered on June 7, 2010, found three grounds had been proven: (1) the twelve month failure to remedy ground; (2) the aggravated circumstances ground; and (3) the subsequent factors ground. The court also found that L.K.W. was adoptable and that it was in his best interest that appellant's parental rights be terminated. The court also ordered appellant returned to the custody of DHS. This timely appeal followed.

We review cases involving the termination of parental rights de novo.[6] The grounds for termination must be proven by clear and convincing evidence.[7] When the burden of proving a disputed fact is by clear and convincing evidence, the question on appeal is whether the circuit court's finding that the disputed fact was proven by clear and convincing evidence is clearly erroneous, giving due regard to the opportunity of the circuit court to judge the credibility of the wit-

6. *Grant v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 636, 378 S.W.3d 227.

7. *Id.*

nesses.[8] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made.[9] A heavy burden is placed on the party seeking the termination of parental rights because it is an extreme remedy in derogation of the natural rights of the parents.[10] Nevertheless, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child.[11] Thus, parental rights must give way to the best interest of the child when the natural parents seriously fail to provide reasonable care for their minor children.[12]

The termination of parental rights is a two-step process that requires the circuit court to find that the parent is unfit and that termination is in the best interest of the child.[13] The first step requires proof of one or more of the statutory grounds for termination.[14] Although appellant likens her situation to that of the appellant in *K.C. v. Arkansas Department of Human Services,*[15] we find that case distinguishable from the present case in that the circuit judge in K.C. found only one ground for termination, the "twelve-month failure to remedy" ground, had been proved while the court found three grounds had been proved in the present case. We need not decide whether the evidence supports the circuit court's finding that the "twelve-month failure to reme-

dy" ground had been proved in this case because we affirm on the basis that the circuit court found that appellant subjected her child to aggravated circumstances.[16]

According to the code, "aggravated circumstances" means that a child has been abandoned, chronically abused, subjected to extreme or repeated cruelty, or sexually abused, or a determination has been made by a judge that there is little likelihood that services to the family will result in successful reunification.[17] The facts of this case show that two possible "aggravated circumstances" exist. First, appellant abandoned her child for five or six months when she fled foster care—the statute does not require that the abandonment last for any particular length of time. Moreover, the definition of "abandonment" also includes such things as appellant posting on the Internet her desire not to be responsible for her child. The circuit court found in its order from the September 2009 review hearing that appellant articulated such an intention. Second, the court also made a finding in the order dismissing DHS's first petition for termination that further services would not likely result in a successful reunification. We, therefore, cannot say that the circuit court clearly erred in finding that at least one ground for termination had been established.

8. *Id.*

9. *Id.*

10. *Id.*

11. *Id.*

12. *Id.*

13. *J.T. v. Ark. Dep't of Human Servs.,* 329 Ark. 243, 947 S.W.2d 761 (1997).

14. Ark.Code Ann. § 9–27–341(b)(3)(B).

15. 2010 Ark. App. 353, 374 S.W.3d 884.

16. Although the circuit court found that multiple grounds had been established, only one ground is necessary to terminate parental rights. *Lee v. Arkansas Dep't of Human Servs.,* 102 Ark.App. 337, 285 S.W.3d 277 (2008).

17. *See* Ark.Code Ann. §§ 9–27–303(6)(A), 9–27–341(b)(3)(B)(ix)(*a*)(*3*)(*B*)(*i*).

The second step requires consideration of whether the termination of parental rights is in L.K.W.'s best interest.[18] This includes consideration of the likelihood that the juvenile will be adopted and the potential harm caused by returning custody of the child to the parent. The court, however, does not have to determine that every factor considered be established by clear and convincing evidence. Instead, after *considering* all of the factors, the evidence must be clear and convincing that the termination is in the best interest of the child.[19]

Because appellant concedes the adoptability prong of the analysis, we turn to the potential-harm prong of the analysis.[20] The harm referred to in the termination statute is "potential" harm; the circuit court is not required to find that actual harm would result or to affirmatively identify a potential harm.[21] The potential-harm evidence, moreover, must be viewed in a forward-looking manner and considered in broad terms.[22]

Section 9–27–341(a)(3) of our juvenile code provides:

The intent of this section is to provide permanency in a juvenile's life in all instances in which the return of a juvenile to the family home is contrary to the juvenile's health, safety, or welfare and it appears from the evidence that a return to the family home cannot be accomplished in a reasonable period of time as viewed from the juvenile's perspective.

There was testimony, and the circuit court found, that appellant's treatment for reactive—attachment disorder could last a year or more. Appellant attempts to minimize this finding by emphasizing the testimony from her therapist that significant progress could be made within three months. However, the therapist also said that this disorder typically required long-term treatment. Moreover, the therapist could not assess appellant's capacity to parent a child without further treatment and progress, and said that there would probably be significant attachment issues if L.K.W. were returned to appellant at the time of the termination hearing without such treatment.

Appellant's indifference to having L.K.W. in her life as manifested by running away from foster care for approximately five or six months shows potential harm to L.K.W. if he were returned to appellant's custody.[23]

Even though appellant argues that Dr. Deyoub testified that, if appellant were able to live in a stable environment and parent under the supervision of another adult, termination of appellant's parental rights might not be necessary, she fails to identify any relative that would allow her to do so. Pamela Hutcherson, her cousin, asked the court to return appellant to DHS's custody. As noted above, there was also no indication that appellant's reactive-attachment disorder could be successfully addressed. This argument also

---

18. Ark.Code Ann. § 9–27–341(b)(3)(A) (Repl. 2009).

19. *McFarland v. Ark. Dep't of Human Servs.*, 91 Ark.App. 323, 210 S.W.3d 143 (2005); *see also Carroll v. Ark. Dep't of Human Servs.*, 85 Ark.App. 255, 148 S.W.3d 780 (2004).

20. There was undisputed testimony, and appellant does not contest the court's finding,

that L.K.W. is adoptable. Thus, we need not discuss this point any further.

21. *Lee, supra.*

22. *Dowdy v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 180, 314 S.W.3d 722; *Lee, supra.*

23. *See Smith v. Ark. Dep't of Human Servs.*, 100 Ark.App. 74, 264 S.W.3d 559 (2007).

ignores the testimony concerning appellant's recent behavior that led Mrs. Hutcherson to request that appellant be removed from her custody, including four suspensions from school and two recent delinquency charges. This behavior also indicates that appellant did not follow the court's orders to stay in school and take her education seriously. The failure to comply with the court's orders also shows potential harm to L.K.W.[24]

As noted earlier, although L.K.W. was with appellant in foster care until appellant ran away, he has been in the custody of DHS his entire life. He has been placed in at least two foster homes. There was also testimony that it would be at least two years before appellant could realistically be ready to independently care for her son. According to the caseworker, L.K.W. was in need of permanency after fifteen months of uncertainty. This is the objective of the termination procedure, and cannot be lightly discounted.[25] We cannot say that the circuit court clearly erred in finding clear and convincing evidence to support the termination of appellant's parental rights.

Affirmed.

ROBBINS and GRUBER, JJ., agree.

---

24. *See Jefferson v. Ark. Dep't of Human Servs.,* 356 Ark. 647, 158 S.W.3d 129 (2004).

25. *See Bearden v. Ark. Dep't of Human Servs.,* 344 Ark. 317, 42 S.W.3d 397 (2001).