Cite as 2024 Ark. App. 517

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CV-24-163

|  |  |
|---|---|
| | **Opinion Delivered** October 30, 2024 |
| KATLYN SCOTT AND STEVEN SCOTT | APPEAL FROM THE SCOTT COUNTY CIRCUIT COURT |
| APPELLANTS | [NO. 64JV-23-15] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD | HONORABLE TERRY SULLIVAN, JUDGE |
| APPELLEES | AFFIRMED |

**BRANDON J. HARRISON, Chief Judge**

Katlyn and Steven Scott separately appeal the circuit court order adjudicating their son, MC, dependent-neglected. Both parents argue that there was insufficient evidence to support a finding of dependency-neglect. We affirm.

The Arkansas Department of Human Services (DHS) first become involved with this family in 2017 when it opened a protective-services case for Katlyn and two of her children.[1] The children were later removed from the home and placed in the permanent custody of their great-grandparents in March 2019.

MC was born in November 2021. On 8 June 2023, DHS opened a protective-services case after it made a true finding of environmental neglect as to Katlyn and Steven. On 25 August 2023, Melissa Dodson, a DHS program assistant, conducted a home visit to

---

[1]Steven is not the father of these children.

the Scotts and found twenty-one-month-old MC lethargic, covered in a rash, and with his eyes rolling back in his head. Dodson asked several DHS family service workers (FSWs) to visit the home and assess the situation. Katlyn told the FSWs that she had no way to take MC to the doctor and that he had been to the doctor on August 21. Dodson found medication prescribed to MC on 15 August 2023, and the bottle was mostly full.

Dodson transported MC and both parents to the emergency room (ER), where MC was diagnosed with impetigo, strep throat, and a viral infection. The ER noted that MC was dirty, dressed only in a diaper, and had a foul odor and greasy hair, which indicated he had not been given appropriate care. The ER confirmed that the severity of the infections could have been avoided if the parents had given MC the medication prescribed to him. To ensure MC's safety, DHS placed a seventy-two-hour hold on him.

On 29 August 2023, DHS petitioned for and was granted emergency custody of MC. The circuit court found probable cause to continue DHS custody on September 15 and convened an adjudication hearing on November 14. That hearing was continued, however, to allow DHS to subpoena medical personnel familiar with MC's treatment.

The court reconvened the adjudication hearing on November 28, and DHS presented the following evidence. Caden Hickman, an ER nurse who treated MC on August 25, testified that MC had presented with a rash over his entire body and some scabbing on his face to the right side of the nostril. He was also "visibly dirty and disheveled with bright red rash on inner thighs and genitals." The parents told Hickman that MC had been prescribed medication for the past couple of weeks for an infection, but after examining the medication label and noting the amount of medication still remaining in the bottle,

Hickman determined that MC was not receiving adequate medication or treatment. On cross-examination, Hickman acknowledged that MC's medical records contain the notation, "Potential concerns for abuse or neglect: None identified." Upon questioning by the court, Hickman explained that while MC had been dirty, he had not felt it necessary to add an extra notation that MC was not being bathed or cleaned appropriately.

Dr. Jonathan Townley, MC's treating ER physician, explained that MC had been seen in the ER ten days prior and had been given a prescription for Keflex to treat infection. On August 25, ten days later, the Keflex bottle was almost entirely full. As a result, MC's infection had not improved, and while his infection was not life-threatening, it could have spread and gotten worse. Dr. Townley did not identify any other concerns with MC.[2] On cross-examination, Dr. Townley stated that "in and of itself in a vacuum" he did not think the matter warranted a hotline call, but a hotline call had been made by one of the nurses. Dr. Townley opined that not promptly filling a prescription would not necessarily rise to the level of neglect.

FSW Amy Maechler testified that after receiving the hotline call for environmental neglect in June 2023, she and FSW Anna Noakes visited the home and observed animal feces and urine on the floor, a large amount of trash and debris in the home, and roaches. MC was in a dirty playpen with no mattress or other bedding, his diaper was very full, and

---

[2]At one point during his testimony, Dr. Townley refers to what excuse was given for why the prescription was not filled and notes that he had not documented the parents' excuse for not filling it. It is not clear from the record, but because the prescription was, in fact, filled as evidenced by the bottle of medication that was in the parents' possession and presented at the ER, this most likely refers to when the prescription was filled or was simply a misstatement by Dr. Townley.

3

he was crying. The FSWs advised the parents that the home needed to be cleaned to a level that was safe by DHS standards. The parents initially made a "huge cleanup effort," but multiple follow-up visits showed those efforts had decline, and the home was falling back into the condition it had been before. The parents explained that they planned to move, that they needed trash bags and cleaning supplies, and that the roaches were from surrounding apartments. The follow-up visits often revealed MC still in a playpen (later, a crib) or highchair, crying, and not being engaged. Maechler also visited the home the day of removal and described MC as raspy, coughing, and very hot to the touch. As for the home, Maechler said that "trash needed to be removed. The floors and things were clearer but dirty." She also said that MC's playpen was dirty and had food in it.

Dodson testified that since the beginning of August, she had worked with the family on homemaking services and had weekly visits. During these visits, MC usually had a "pretty full" diaper and was in the crib or the highchair. On the day of removal, Dodson arrived at the home and found the Scotts' roommate outside looking for diapers in Steven's car. Neither Steven, Katlyn, nor the roommate had a driver's license at that time. Once inside, Dodson noticed that MC "did not look very well," had a rash, and felt very warm. The parents told her that MC had sinus issues and a skin condition and was on medication. When she suggested that MC see a doctor again, the parents said they had no way to get there. Dodson left to buy diapers and wet wipes, called Maechler and Noakes, and returned to the home. Dodson later transported the family to the ER and waited in the waiting area; after seeing the doctor, Katlyn reported to Dodson that "it was allergies and a skin condition" and that "[MC] had a temperature of 102.7."

4

FSW Erin Hartley, the primary caseworker, testified that she accompanied Dodson on some of her homemaking visits and referred the parents to SafeCare Parenting. Her safety concerns with the family were the environmental neglect and the lack of adequate supervision for MC. She usually found MC in his playpen or his highchair, and "the home didn't allow him to run freely" because of the trash and other debris on the floor. On the day of removal, the home had been in better shape, although there was still some trash and an overflowing litter box. MC appeared as if he did not feel well; he was "wheezing, reaching for his throat." Hartley was concerned that MC was not receiving the medical attention that he needed and that the parents did not seem to understand the necessity of going to the doctor again. She clarified that MC's removal had been based on medical neglect.

After hearing all the testimony, the circuit court found MC dependent-neglected:

> I'm taking into account the totality of the circumstances in this case regarding the history going back—what—six years with the family? Including the loss of custody of two other children of the mother. I think the juvenile's health and safety are in danger because of environmental neglect, the failure to provide medical care, and to—the state of the child, the child being dirty, and the prior history. Taking all of that into account, I find this child to be dependent-neglected and the child will remain in the care and custody of the Department.

The court's written order specified the dependency-neglect is due to medical and environmental neglect. The court explained,

> In making the finding, the Court is looking at the totality of the circumstances. There is history with this family going back to 2017. There was a hotline report in June 2023 reporting the conditions of the home. The Department continued to work with the family for another six weeks. The juvenile had a fever. There was an issue that a bottle of medicine was not properly filled for the juvenile, and the parents had reported taking the juvenile to the doctor 10 days previously. The Department requested the

5

parents take the juvenile to the doctor, to which the parents responded they did not have a way to get the juvenile to the doctor, despite a running vehicle being at the residence. At the hospital, the juvenile had scabbing, rash, fever, sore throat, and a bottle of medicine that had not been utilized. Although not life threatening, there was testimony that it was unknown what would have happened specifically. Specifically, the Court finds that the allegations in the petition and accompanying affidavit are substantiated by the proof.

Katlyn and Steven both filed timely notices of appeal from the circuit court's order.

Adjudication hearings are held to determine whether the allegations in a petition are substantiated by the proof. Ark. Code Ann. § 9-27-327(a)(1)(A) (Supp. 2023). Dependency-neglect allegations must be proved by a preponderance of the evidence. Ark. Code Ann. § 9-27-325(h)(2)(ii) (Supp. 2023). The standard of review on appeal is de novo, but we do not reverse the court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. *Lipscomb v. Ark. Dep't of Hum. Servs.*, 2010 Ark. App. 257. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* This court defers to the circuit court's evaluation of the credibility of the witnesses. *McCord v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 244, 599 S.W.3d 374.

Katlyn and Steven challenge the circuit court's findings that MC is dependent-neglected on the grounds of medical and environmental neglect. A dependent-neglected juvenile is defined, in part, as any juvenile at substantial risk of serious harm as a result of neglect. Ark. Code Ann. § 9-27-303(17)(A)(v) (Supp. 2023). Neglect includes failure or irremediable inability to provide for the essential and necessary physical, mental, or emotional needs of the juvenile, including failure to provide a shelter that does not pose a

6

risk to the health and safety of the juvenile; and failure to provide for the juvenile's care and maintenance, proper or necessary support, or medical, surgical, or other necessary care. Ark. Code Ann. § 9-27-303(37)(A)(iv) & (v).

"The statutory definition of a neglected child does not require proof of actual harm or impairment having been experienced by the child. The term 'substantial risk' speaks in terms of future harm." *Maynard v. Ark. Dep't of Hum. Servs.*, 2011 Ark. App. 82, at 7, 389 S.W.3d 627, 630. A dependency-neglect adjudication occurs without reference to which parent committed the acts or omissions leading to the adjudication; the juvenile is simply dependent-neglected. *Heggins v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 45, 659 S.W.3d 716. Only one basis is necessary to support a dependency-neglect finding. *Id.*

In her brief, Katlyn first argues that the evidence was insufficient to support a finding of dependency-neglect based on medical neglect. She reviews the medical-related testimony, primarily that of Caden Hickman and Dr. Townley, and notes that neither medical professional had documented any concerns about abuse or neglect in MC's medical records or felt it necessary to call the child-maltreatment hotline. Katlyn acknowledges that DHS had produced evidence of MC's infection and a prescription to treat it, even though it did not appear MC had received the proper amount of medication as of August 25. But DHS failed to show "what date the prescription was filled and what the substantial risk of serious harm to MC was in regards to either the date of the medical visit or even in the future." She argues that there was no defined substantial risk presented "but for the development of a worse infection." The parents sought medical treatment and filled the prescription they were given, although apparently not as promptly as DHS would have

7

liked. Katlyn concludes that MC was removed from his parents' custody and placed in foster care for what was essentially a diaper rash and a fever.

Steven's argument on appeal echoes Katlyn's argument; he contends that MC was removed because his parents had not properly administered his medication. MC's medical records contained no concerns of abuse or neglect, and neither Dr. Townley nor Hickman felt it necessary to call the child-maltreatment hotline.

In response, DHS asserts that there was sufficient evidence of medical neglect. The evidence demonstrated that MC's prescription had not been filled when prescribed and had not been administered as prescribed. As a result, MC's infection had not gotten better and could have developed into a worse infection. Further, the parents did not seem to understand the concern for the child and thought that the ER visit ten days prior sufficed. And while explaining that they had no way to take MC to the doctor that day, they did not ask for help with transportation; instead, they agreed to go to the ER at DHS's suggestion.

We hold that the circuit court did not err in finding MC dependent-neglected due to medical neglect. The parents are essentially requesting that the evidence before us be reweighed, but the circuit court weighing the evidence differently than the parents wanted it to be weighed is not reversible error. *Posey v. Ark. Dep't of Health & Hum. Servs.*, 370 Ark. 500, 262 S.W.3d 159 (2007). The appellate court will not act as a "super factfinder," substituting its own judgment or second guessing the credibility determinations of the court; we only reverse in those cases where a definite mistake has occurred. *Robinson v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 251, 4, 520 S.W.3d 702, 704–05. Here, the parents did not properly administer necessary medication to MC and felt no urgency in seeking further

8

medical attention, even though MC was visibly ill and feverish. The circuit court also noted an extensive history (seven years) with the family. On the whole, we hold that a preponderance of the evidence supports the finding that MC is at substantial risk of serious harm if returned the parents.

Because only one basis is necessary to support a dependency-neglect adjudication, *Heggins*, *supra*, we need not discuss the other grounds for dependency-neglect discussed by the parents.

Affirmed.

GLADWIN and BROWN, JJ., agree.

*Eden Law Firm*, by: *Kimberly Eden*, for separate appellant Katlyn Scott.

*Jennifer Oyler Olson*, Arkansas Commission for Parent Counsel, for separate appellant Steven Scott.

*Kaylee Wedgeworth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor child.