Cite as 2025 Ark. App. 491

# ARKANSAS COURT OF APPEALS
DIVISION IV
No. CV–25–192

| | |
|---|---|
| AMY LINDSEY AND LOGAN RUCINSKI<br><br>APPELLANTS<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD<br><br>APPELLEES | **Opinion Delivered** October 22, 2025<br><br>APPEAL FROM THE CRAWFORD COUNTY CIRCUIT COURT<br>[NO. 17JV-23-65]<br><br>HONORABLE MICHAEL MEDLOCK, JUDGE<br><br>AFFIRMED |

## BRANDON J. HARRISON, Judge

Amy Lindsey and Logan Rucinski appeal the Crawford County Circuit Court's order terminating their parental rights to their son, MC, who was born 21 December 2023. Both parents contend the court clearly erred by finding termination was in MC's best interest without exploring placement with Logan's sister, who was undergoing an Interstate Compact for the Placement of Children (ICPC) evaluation in Missouri. Logan also challenges the findings that there were grounds to terminate his parental rights. We affirm the termination of both parents' parental rights.

I.

To terminate parental rights, a circuit court must find by clear and convincing evidence that there is at least one ground for termination and that termination is in the juvenile's best interest. *L.W. v. Ark. Dep't of Hum. Servs.*, 2011 Ark. App. 44, 380 S.W.3d

489.  "Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established." *Watkins v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 55, at 4.  In the best-interest determination, the circuit court must consider the likelihood that the juvenile will be adopted and the potential harm that could be caused to the juvenile if returned to the parent.  *L.W.*, *supra.*  However, unlike the statutory grounds for termination, potential harm and adoptability are merely factors for the circuit court to consider, and each factor need not be established by clear and convincing evidence.  *Id.*

We will not reverse a termination order unless the findings were clearly erroneous, meaning that although there may be evidence to support them, the entire evidence leaves us with a definite and firm conviction that a mistake has been made.  *Id.*  Further, we give due regard to the circuit court's ability to assess a witness's credibility.  *Id.*

However, we review these cases de novo on the record.  *Parnell v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 108, 538 S.W.3d 264.  We emphasize that this means the *appellate* record.  Typically, most of the appellate record is the testimony and evidence at the termination hearing.  It does not include things (for example) that no one asked about at the termination hearing because everyone had heard the evidence in previous hearings.  Although we affirm as to both parents, we advise the Arkansas Department of Human Services (DHS) that affirming grounds for termination was a close call—perhaps necessarily, perhaps not—because the proof it offered on important points was terse, if not conclusory.[1]

---

[1]For example, in a case where parental drug use was an issue, we should not have had to scour the record to identify the drug as methamphetamine.

II.

In April 2023, Amy was living with MC and Logan in Van Buren. Her husband lived somewhere else. DHS removed MC from Amy's custody April 30 after a domestic-violence incident that involved Amy and Logan. Logan called police, and Amy was arrested. Logan is MC's biological father, but paternity had not yet been settled. Amy's arrest left no one with custody of MC.[2] On May 3, DHS petitioned for emergency custody and a dependency-neglect finding. The circuit court entered an ex parte order granting the emergency hold the same day. On May 20, it found probable cause for the emergency order to continue. Additionally, the court ordered Amy and Logan to cooperate with DHS, comply with the case plan, resolve all criminal charges, maintain stable housing and employment, and remain sober. It was not Amy's first experience with DHS: she lost custody of an older child to her husband after she was incarcerated. And both Amy and Logan had lingering criminal issues that would come into play later.

On June 7, the court adjudicated MC dependent-neglected on the ground of parental unfitness. It found that Logan is MC's parent, set a goal of reunification, and ordered both parents to comply with the court's previous orders. During the intermediate hearings that followed, the court found DHS had made reasonable efforts toward the case-plan goal. At first, the goal was reunification. At the August and October 2023 hearings, the court found that Amy and Logan were in compliance with the case plan and kept the goal of reunification. The court ordered them to complete a hair-follicle test and attend parenting

---

[2]Amy's husband Joseph Lindsey consented to relinquish his parental rights to MC in May 2023. The court terminated them in June 2023.

classes. In January 2024, it found that Amy and Logan had not proved they had completed services. Further, it found they had used illegal drugs during the review period and had not maintained stable housing or employment.

At a permanency-planning hearing in April 2024, the court found that Amy and Logan were not in compliance with the case plan and had not provided proof that they had completed any services. It changed the goal to adoption. And it ordered them to comply with its previous orders.

On 6 November 2024, the circuit court held a hearing on DHS's October 3 petition to terminate both parents' parental rights. In an order entered 14 January 2025 and supplemented January 22, the court found that DHS had met its burden of proof as to both parents on three statutory grounds for termination. Because Amy does not contest that the Department proved grounds for termination, we discuss them as they apply to Logan.

First, the circuit court found there were grounds to terminate under the noncustodial-parent ground, under which a court may terminate parental rights

> if a juvenile has been adjudicated by the court to be dependent–neglected and has continued out of the home of the noncustodial parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that prevented the child from safely being placed in the parent's home, the conditions have not been remedied by the parent.

Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(b)* (Supp. 2023). Next, it found that after DHS had filed the original petition, other issues arose that demonstrated that placing MC with Logan "is contrary to [MC's] health, safety, and welfare, and, despite the offer of appropriate family services, [Logan] manifests the incapacity or indifference to remedy the subsequent factors that prevent placement with the parent." *Id.* § 9-27-341(b)(3)(B)(vii)*(a)*. Finally, it found

4

that MC was subjected to aggravated circumstances because there was little likelihood continued services would result in reunification. *Id.* § 9-27-341(b)(3)(B)(ix)*(a)(3)(B)(i)*. Proof of even one statutory ground for termination is sufficient for this court to affirm. *Perry v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 193, 625 S.W.3d 374.

The major issue, from the start of this case, was domestic violence. The affidavit attached to the petition for emergency custody states that during the April 30 incident, "Mother, Amy Lindsey . . . was arrested tonight after [law enforcement] responded to the home due to a domestic disturbance with mother reported as the aggressor. Putative father, Logan Rucinski . . . . was on scene and called 911 for [law enforcement] assistance." Amy was arrested and charged with "endangering the welfare of a minor in the third degree (Ark. Code Ann. § 5-27-207) and assault on family or household member in the second degree (Ark. Code Ann. § 5-26-308)."

At the termination hearing, Amy testified those charges had been resolved. But she acknowledged a history of domestic violence going both ways when she and Logan were together. Greg Steinsiek, a DHS foster care supervisor who was on call when the April 30 call came in, echoed that testimony. In March 2024, he said, Amy and Logan were both arrested for an incident that involved domestic violence and drugs. Logan denied being convicted of domestic violence but admitted he spent a week in jail.

DHS introduced an order from October 2024 in *State v. Logan Rucinski*, case number 36CR-19-399, that continued a status hearing in a pending petition to revoke probation or

a suspended sentence.[3] (Logan said his lawyer told him it was being dismissed.) Amy had been incarcerated for about three or four total months since the case opened, according to Steinsiek. She was a few months into a six-year probation term at the hearing.

By then, both parents had demonstrated improvement in some areas. Logan had completed inpatient drug treatment. Amy had not, but she testified she had been clean for four months and had almost finished drug rehab before being kicked out for hurting someone's feelings. She had been working recently and testified she was diligently looking for another job. Logan was receiving counseling through the Veterans Administration. For about three months, he had been working at a countertop-installation job he could walk to from the camper where he'd been living. Though he rented the lot—two lots away from his sister—he owned the camper.

The problem (in a roundabout way) is that it was in Missouri, which was Logan's third state of residence in eight months. He moved there after working for two and a half months in Ohio following inpatient drug rehab. According to Steinsiek, this did not demonstrate the stability MC needed. Since April 17, Logan had attended only eight of twenty-eight visitations. Further, Steinsiek said that since Logan left the state, "it's been really difficult to work services with him" because the policies and laws among the three states "do not always coexist." DHS also lacked access to his home. And while Logan was out of state, DHS could not conduct random drug tests.

---

[3]We don't know what the original charge or sentence was or why the State was trying to revoke it. We should know.

Logan testified that DHS's Ohio counterpart agency drug tested him when he lived in Ohio. The Missouri agency did not. Logan had not failed any of the drug tests he did take, he testified. He promised at the hearing that he was clean for everything but marijuana, which is legal in Missouri.

Logan and Amy were both offered domestic-violence classes at the outset of the case. Seventeen months later, neither had completed an approved course. Logan admitted he did not start until two months before the hearing and was only halfway done. Amy was midway through a twenty-four-week program. The couple had not lived together since March 2024, they said. But there was evidence they might not stay apart either: Amy testified that she had taken a pregnancy test, and it was positive. She admitted Logan might be the father.

A. Grounds to Terminate Logan's Parental Rights

The circuit court did not clearly err by finding that DHS met its burden of proving by clear and convincing evidence that there were grounds to terminate Logan's parental rights. Despite services offered and provided by DHS, Logan continued to engage in domestic violence with Amy. His voluntary move out of state prevented DHS from confirming with random drug tests that he was a safe and sober parent, and he failed to complete domestic-violence classes. He thus failed to correct the conditions that prevented MC from being safely placed with him and manifested the incapacity or indifference to remedy the subsequent factors that prevented placement of MC with him. *See Rivera v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 405, 558 S.W.3d 876 (holding failure to comply with court orders is a subsequent factor on which termination can be based); *Mayer v. Ark. Dep't of Hum. Servs.*, 2025 Ark. App. 51 (affirming aggravated-circumstances ground where

7

voluntary move out of state by appellants who had not completed services made it more difficult to take advantage of them).

Logan argues that the circuit court clearly erred by finding these grounds because the issues that involved him did not arise until eight months before the termination hearing, and he began to participate in services to remedy them. The record was not so one-sided on when his issues began. Logan was involved in the domestic-violence incident that caused MC to come into care in April 2023. True, law enforcement did not *arrest* him. But only Amy's husband was found not to have contributed to the related dependency-neglect. Additionally, Steinsiek testified that both parents had drug-use issues since the start of the case.

Logan argues that the circuit court overstepped by weighing his failure to complete domestic-violence classes "as heavily in DHS's favor as possible[.]" But reweighing evidence is not our role in these cases. *E.g.*, *Reyes-Ramos v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 46, 571 S.W.3d 32. Anyway, domestic violence was *the* day-one issue. By the termination hearing, the case had been open for almost seventeen months, and Logan had begun domestic-violence classes less than two months earlier. Evidence of eleventh-hour improvements will not necessarily outweigh evidence of past noncompliance. *Kelley v. Ark. Dep't of Hum. Servs.*, 2024 Ark. App. 475, 699 S.W.3d 165.

## B. Whether Termination was in MC's Best Interest

Sufficient evidence also supports the circuit court's finding that terminating both parents' rights was in MC's best interest. The best-interest determination requires the court to consider the juvenile's adoptability and the potential harm caused by returning the

8

juvenile to the parent. *Harris v. Ark. Dep't of Hum. Servs.*, 2024 Ark. App. 135, 684 S.W.3d 348. We don't need to address the adoptability factor because no one challenges it on appeal. *Ealy v. Ark. Dep't of Hum. Servs.*, 2024 Ark. App. 610, 701 S.W.3d 813. Logan does challenge the potential-harm factor. And both parents argue that the circuit court should have considered whether placement with Logan's sister, not termination of their parental rights, was in MC's best interest.

When considering potential harm, a circuit court is not required to identify actual harm, and potential harm must be viewed in a forward-looking manner. *Id.* Additionally, we have held that "a parent's failure to comply with court orders itself is sufficient evidence of potential harm." *E.g.*, *Gonzalez v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 425, at 12–13, 555 S.W.3d 915, 921–22. Further, "the circuit court may consider past behavior as a predictor of likely potential harm should the child be returned to the parent's care and custody." *Ealy*, 2024 Ark. App. 610, at 8, 701 S.W.3d at 818.

Here, there was sufficient evidence to support a potential-harm finding because Logan failed to comply with the case plan and, despite reengaging in the domestic violence that caused removal, did not begin court-ordered domestic-violence classes until less than two months before the termination hearing. *See Harris*, *supra* (affirming the best-interest finding where domestic violence was cause of removal and parent did not complete domestic-violence classes).

Citing *Mason v. Arkansas Department of Human Services*, 2022 Ark. App. 124, 642 S.W.3d 260, Logan argues otherwise because the record showed just one instance of domestic violence and drug use after MC was taken into custody and (he contends) no

9

evidence he continued to have a relationship with Amy. We reject the comparison to *Mason*. In *Mason*, a circuit court terminated the parental rights of a father who demonstrated exemplary progress and compliance with the case plan—but also poor judgment (the court felt) in choosing a paramour with felony and misdemeanor drug convictions. *See id.* at 16, 642 S.W.3d at 269. We held this was insufficient, standing alone, to support a potential-harm finding. We followed *Mason* in *Richie v. Arkansas Department of Human Services*, where a parent likewise successfully completed services but was sandbagged by a toxic relationship. 2023 Ark. App. 219, at 5. But even full compliance with services is not determinative. *Robinson v. Ark. Dep't of Hum. Servs.*, 2024 Ark. App. 64, 684 S.W.3d 219. And we don't have full compliance here: the circuit court cited Logan's *lack* of compliance with the case plan as a reason for termination.

Finally, both Amy and Logan argue that the circuit court erred by finding termination was in MC's best interest because an ICPC home study for Logan's sister was still pending. Arguments that a possible relative placement is in the child's best interest must be made and ruled on in the circuit court. *Hile v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 173. Neither parent made that argument here. Even in termination cases, we will not address issues raised for the first time on appeal. *Tuck v. Ark. Dep't of Hum. Servs.*, 2014 Ark. App. 468, 442 S.W.3d 20.

Moreover, a circuit court can terminate parental rights even if there is a relative available for custody. *E.g.*, *Blankenship v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 63, 661 S.W.3d 227. Here, as in *Blankenship*, the person the parents propose for relative placement never had custody of MC, and testimony at the termination hearing raised concern that she

would give a parent continued access to the child. *See id.* at 19–20, 661 S.W.3d at 238. Both DHS and its Missouri counterpart expressed concern that Logan's sister lived just two doors away from him. Further, a program assistant for DHS testified that Logan told her at a supervised visitation that when his sister got custody of MC, she was going to "give the rights back to him."

Affirmed.

TUCKER and MURPHY, JJ., agree.

*Elizabeth James*, Arkansas Commission for Parent Counsel, for separate appellant Amy Lindsey.

*Dusti Standridge*, for separate appellant Logan Rucinski.

*Ellen K. Howard*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor child.