Cite as 2026 Ark. App. 149

# ARKANSAS COURT OF APPEALS
DIVISION IV
**No.** CV-25-400

| | |
|---|---|
| KATLYN SCOTT AND STEVEN SCOTT | **Opinion Delivered** March 4, 2026 |
| APPELLANTS | APPEAL FROM THE SCOTT COUNTY CIRCUIT COURT [NO. 64JV-23-15] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD | HONORABLE TERRY SULLIVAN, JUDGE |
| APPELLEES | AFFIRMED |

## BRANDON J. HARRISON, Judge

Katlyn and Steven Scott appeal the Scott County Circuit Court's order terminating their parental rights to Minor Child (MC), who was born 29 November 2021. The circuit court found clear and convincing evidence for three statutory grounds to terminate both parents' parental rights, and that doing so was in MC's best interest. Steven argues there was too little support for those findings. Katlyn, who had been living apart from Steven for many months by the termination hearing, does not deny there were grounds to terminate her parental rights. She argues the circuit court erred by finding termination was in MC's best interest without confirming whether he could achieve permanency (and honor the statutory preference for relative placements) through placement with her sister. We affirm termination as to both parents.

I.

This is the second appeal in this case. Steven appealed the circuit court's 12 December 2023 order adjudicating MC dependent-neglected based on medical and environmental neglect. We affirmed. *Scott v. Ark. Dep't of Hum. Servs.*, 2024 Ark. App. 517, 699 S.W.3d 851. The facts that led the Arkansas Department of Human Services (DHS) to take custody of MC are recited in more detail in that opinion. Briefly, Katlyn had a history with DHS involving two previous children dating back to 2017. *Id.* at 1, 699 S.W.3d at 852. DHS opened a new case involving MC in June 2023 after receiving a hotline call about environmental neglect. *Id.*

Ten days before the DHS home visit that started these proceedings rolling, the Scotts had taken MC to the emergency room for a high fever. *Id.* at 3, 699 S.W.3d at 853. He was diagnosed with strep throat and discharged the same day (August 15) with a prescription for Keflex, an antibiotic. On August 25, DHS conducted a home visit in the protective-services case. The DHS employees found MC feverish and lethargic, with his eyes rolling back in his head, and covered with a rash. He was dirty and unkempt, and had a foul odor. His Keflex prescription had been filled, but—ten days after the ER visit—the bottle was almost completely full.

Neither parent had a driver's license or transportation; a DHS program specialist drove them to the ER again. *Id.* at 4, 699 S.W.3d at 854. At the hospital, MC was diagnosed with impetigo, strep throat, and a viral infection. An ER doctor said that the infection would not have been as severe if the Scotts had provided appropriate care when

the medication was first prescribed. Indeed, he said that if DHS personnel had not already been present, he would have had to make a report for medical neglect.

The circuit court entered an ex parte order for emergency custody on DHS's petition a few days later. It adjudicated MC dependent-neglected after a two-day hearing in November 2023. The case goal then was reunification. The court ordered both parents to follow the case plan and the court's orders.

We affirmed the dependency-neglect finding in *Scott*, *supra*. The mandate issued 13 November 2024. Meanwhile, the court had continued to hold hearings. After a March 2024 review hearing, it found Steven had strengths in employment and health but often used bad judgment. Further, it found the Scotts' living conditions were "deplorable" and the house was "abominable." There was trash and animal excrement spread throughout.

For reasons we don't know, the Scotts separated while the appeal was pending.[1] Since the separation, Katlyn had moved through seven residences in Waldron and small towns in Crawford County. While staying with a friend, Katlyn became romantically involved with the friend's boyfriend. At the termination hearing, she testified she was engaged to him and depended on food stamps and his income. Apart from two months, she was unemployed throughout the case.

During the same period, Steven worked full time for Tyson at a chicken-processing facility. But the stability and appropriateness of his housing situation continued to be issues. After a permanency planning hearing in July 2024, the court noted that Steven had made

---

[1]Both parents testified they were waiting to hire a divorce lawyer with their tax refund.

3

progress in the case but was about to be evicted and had not found suitable replacement housing. After a review hearing in October 2024, it found that though he had made progress in some areas, the condition of his home at an October 6 home visit was "abysmal and totally inappropriate and unsafe for the juvenile." He was living in Boles then with his aunt Betty and her five dogs in a two-bedroom trailer. He continued to live there through the end of this record.

DHS petitioned to terminate the Scotts' parental rights in October 2024 on four grounds: twelve months' failure to remedy; twelve months' failure to provide significant material support or maintain meaningful contact; subsequent factors; and aggravated circumstances, specifically that there was little likelihood that continued services would result in successful reunification. In the background, it had been exploring placement for MC with Kallie Bales, MC's maternal aunt in Colorado. By the October 2024 review hearing, the court had received a favorable Interstate Compact on the Placement of Children (ICPC) home study on Bales and her current partner. However, Bales was still married to someone else. The court warned it would not consider placement until her divorce was final. Bales finalized it; on December 16, DHS moved for discretion to place MC with Bales, attaching a copy of her 7 November 2024 divorce decree.

The termination hearing began 14 January 2025 and resumed 11 March 2025. The Department introduced photos from home visits to Betty's trailer starting in October 2024. DHS caseworker Melissa Meyers and program assistant Amber Duncan took the photos. They testified about what they observed at the home. In early photos, virtually every horizonal surface is stacked with things or boxes of things. One of the things is a bong.

(Betty's, Meyers said.) Boxes and storage containers are stacked as many as four or five high from the floor, even in the kitchen. Meyers testified she was concerned MC could pull them over on himself. She was also concerned about an air conditioner with frayed wires.

They testified there were other problems the photos didn't show, including dog urine and feces and a strong odor. Meyers testified that hygiene had been a consistent problem for both parents. It was bad enough that during visits at other houses, other parents had complained about the smell because "it's just kind of a lingering odor." (She acknowledged that Steven worked at a chicken-processing plant and might have brought the odor home.) The conditions in Betty's trailer waxed and waned, better one visit, worse at another. At the December visit, Duncan said, there was dog urine and feces in the carpet, and it smelled pretty bad. There were stacked dishes and food everywhere. This was not Christmas clutter. Duncan said she noticed dog messes and offensive odors every time she visited the house. Meyers acknowledged the house was much cleaner in January 2025—"better but not clean," according to Duncan. But Steven's closet, which was right next to MC's intended crib, was stacked "all the way to the ceiling" with stuff.

The Department was more concerned with what they *couldn't* see: Betty refused to let them enter or look in two rooms, including her bedroom. According to Duncan, Betty said she put the dogs in her bedroom so they wouldn't bite. Meyers expressed concern about the dogs, but they stayed. Steven testified that no one was allowed in his aunt Betty's bedroom because there were "firearms back there" and "blades back there." He said she was currently sleeping on the couch because that bedroom was "being rearranged."

According to Steven, the January 2025 home visit left him with the impression that the home was now appropriate. On February 28, Meyers and Duncan made an unannounced visit. There was trash on the porch. Duncan noticed an odor even as she walked up to the house. The odor was "even stronger whenever he opened the door and came out." Steven refused to let them in. Anna Noakes, A DHS supervisor, testified that although Steven interacted well with MC during supervised visits, the Department had never offered unsupervised visits because "his home hasn't been appropriate to bring the child to." And at the last attempt to assess the home—that February 28 visit—DHS was denied access. "So we don't know."

## II.

The circuit court found DHS had proved by clear and convincing evidence that there were three of four grounds DHS pleaded in the petition to terminate the Scotts' parental rights: the twelve-month failure-to-remedy ground, Ark. Code Ann § 9-27-341(b)(3)(B)(i)*(a)* (Supp. 2023); the subsequent-factors ground, *id*. § 9-27-341(b)(3)(B)(vii)*(a)*; and the aggravated-circumstances ground, *id*. § 9-27-341(b)(3)(B)(ix)*(a)*.[2] Steven admits all three findings are based on similar facts, chiefly his housing and stability.[3]

In the court's bench ruling, it noted that one of the reasons the case opened was the "abominable" conditions in the home. Though Steven (unlike Katlyn) had transportation

---

[2]The Juvenile Code was repealed and recodified by Act 518 of 2025. However, the Act was not in effect when the circuit court entered the termination order.

[3]The proof relevant to grounds for termination diverges somewhat at the parties' separation. Because only Steven contests that issue, we discuss his part.

and employment, "neither parent has shown an ability to provide a stable environment for themselves, much less this young child." Further, the court found it significant that Steven's aunt would not allow DHS access to her locked bedroom, and Steven had refused to let a caseworker enter the home at all.

Steven argues that none of those grounds was supported by clear and convincing evidence. But proof of even one ground is enough to affirm a termination if the best-interest requirement is met. *Boomhower v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 397, 587 S.W.3d 231. There was sufficient proof for the failure-to-remedy ground here.

The Department's burden of proof in termination-of-parental-rights cases is clear and convincing evidence, a "degree of proof that will produce in the finder of fact a firm conviction" as to what it must establish. *Ring v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 146, at 5, 620 S.W.3d 551, 555. We review de novo on the appellate record. *Lindsey v. Ark. Dep't of Hum. Servs.*, 2025 Ark. App. 491. But we will not reverse unless the court's findings were clearly erroneous, meaning that although there may be evidence to support them, the entire evidence leaves us with a definite and firm conviction that a mistake has been made. *Id.* In that analysis we give the circuit court's findings some deference because we cannot observe the witnesses' testimony and assess their credibility, as it could. *Wagner v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 400, 675 S.W.3d 469.

Under the failure-to-remedy ground, the circuit court may terminate parental rights if it determines

> [t]hat a juvenile has been adjudicated by the court to be dependent-neglected and has continued to be out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the

7

parent and correct the conditions that caused removal, those conditions have not been remedied by the parent.

Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(a)*.

Though the medical-neglect issue might have precipitated DHS's decision to remove MC from the Scotts' custody, the court adjudicated MC dependent-neglected because of environmental neglect as well. We did not decide (or need to decide) in the first appeal whether that finding was adequately supported; however, we recited evidence that when DHS responded to the Scotts' home after the June 2023 hotline call, the DHS employees found "animal feces and urine on the floor, a large amount of trash and debris in the home, and roaches." *Scott*, 2024 Ark. App. 517, at 3, 699 S.W.3d at 853. MC himself was "in a dirty playpen with no mattress or other bedding, his diaper was very full, and he was crying." *Id.* at 3–4, 699 S.W.3d at 853. Though conditions had sometimes improved—the Scotts initially made a "huge cleanup effort"—follow-up visits showed the home was falling back into that original state. *Id.* at 4, 699 S.W.3d at 853.

The circuit court was aware of all this. And all of it sounds familiar. We must affirm the circuit court's finding that Steven failed to remedy the environmental neglect that caused MC's removal from the home, even if it was a closer call than some. We do not reweigh the evidence to make findings in the first instance; we review the circuit court's findings for clear error. *Lindsey*, *supra*. The Scotts' inability to provide a consistently safe home environment for MC was a theme in this record. Steven argues we should reverse even so because there was insufficient proof of a "meaningful effort" by DHS to correct those conditions. But we cannot entertain that argument. He did not appeal the previous orders finding DHS *had* made reasonable efforts or raise that issue at the termination hearing.

*Yarbrough v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 429, at 7–8, 501 S.W.3d 839, 843–44 (collecting cases).

III.

Finally, both parents argue, albeit for different reasons, that the circuit court erred by finding termination was in MC's best interest. The circuit court must base its best-interest finding on consideration of at least two factors, the likelihood of adoptability and the potential harm caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i)–(ii). Neither parent challenges the circuit court's finding that MC is adoptable.

Steven argues that, for the same reasons he contends there was insufficient evidence of grounds for termination, there was insufficient evidence of potential harm. The ultimate issue in any termination-of-parental-rights case, regardless of a parent's compliance with a case plan, is whether the parent has become a stable, safe parent able to care for his or her child. *Cobb v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 85, 512 S.W.3d 694. Further, a child's need for permanency and stability may override a parent's request for more time to improve his circumstances. *Id*.

In the termination order, the circuit court observed that "we are at 19 months in this case and not even close to the parents having unsupervised visitation." It found neither parent was compliant with counseling and visitation, nor did either parent have suitable housing. Though Steven had attended court-ordered counseling until October 2024, his therapist had since discharged him for "no showing" several sessions. Steven testified in March 2025 that the provider stopped sending reminders and, without them, he lost track

of the days. Indeed, he both displayed and admitted trouble judging how much time had passed. He could not recall the month he had last seen a counselor, or even whether it was within the last month and a half. He said, "[M]y days and months are so clustered together, I barely remember yesterday." Challenged, he repeated, "I barely remember what all happened yesterday." He had not gone to counseling since November.

The potential-harm factor of the best-interest analysis does not require the circuit court to find *actual* harm would occur or affirmatively identify the potential harm. *Phillips v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 169, 596 S.W.3d 91. The evidence must be viewed in a forward-looking manner and considered in broad terms. *Id*. Given how the removal proceedings started—with both parents failing to administer antibiotics MC had been prescribed for a serious illness—we could not reverse the circuit court on this point.

Finally, Katlyn argues the circuit court erred by finding termination was in MC's best interest without considering whether MC could achieve permanency (and preserve the family ties to her) through a relative placement with Bales. She did not preserve that argument for appeal. The circuit court was aware that an ICPC home study for Bales had been approved, and that DHS supported placing MC with her. DHS's motion for discretion to make that placement was still pending in March 2025; the court mentioned it, and promised a hearing on it, after the termination hearing ended.

But the parties had not argued, for example, that the court should determine her suitability for placement before the termination hearing and consider it instead of

10

termination. There are indications Bales cooperated and was willing to accept custody.[4] But she had not moved to intervene in the action, and there was no evidence she had an existing bond with MC. *Compare Borah v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 491, 612 S.W.3d 749 (reversing termination where testimony established that grandmother who had a bond with child had repeatedly tried to receive placement). The parties in termination–of–parental–rights cases are not excused from preserving arguments in circuit court. We do not reverse a circuit court for ignoring relative-placement issues without evidence it was asked to consider them. *Lindsey*, *supra*; *Hile v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 173; *Huggins v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 371.

Affirmed.

TUCKER and THYER, JJ., agree.

*Jennifer Oyler Olson*, Arkansas Commission for Parent Counsel, for separate appellant Steven Scott.

*Dusti Standridge*, for separate appellant Katlyn Scott.

*Kaylee Wedgeworth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain* and *Linda J. Hamilton*, attorneys ad litem for minor child.

---

[4]The transcript indicates Bales was present for the first day of the termination hearing in January 2025. She did not testify.